NAPA PITTSBURGH, INC.,
Appellee,

v.

AUTOMOTIVE CHAUFFEURS, PARTS
AND GARAGE EMPLOYEES, LOCAL
UNION NO. 926, et al., Appellants.

No. 73–1798.

United States Court of Appeals,
Third Circuit.

Argued Feb. 28, 1974.

Submitted on Rehearing en banc
June 12, 1974.

Decided Aug. 8, 1974.

James Hunter, III, Circuit Judge, dissented and filed opinion, and Seitz, Chief Judge, joined in dissent.

Adams, Circuit Judge, dissented and filed opinion.

Elmer E. Myers, David H. Perez, R. A. King, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for appellee.

Herman L. Foreman, James B. Brown, Rothman, Gordon, Foreman & Groundine, Pittsburgh, Pa., for appellants.

Argued February 28, 1974

Before HUNTER and WEIS, Circuit Judges, and BECKER, District Judge.

Submitted in banc June 12, 1974

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

This is an appeal from an order enjoining appellant Automotive Chauffeurs, Parts and Garage Employees, Local Union No. 926 (Local 926) from refusing to cross a picket line maintained by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 110 (Local 110). The question presented is whether the district court erred in issuing a preliminary injunction against Local 926 and in ordering arbitration of the differences between the parties in accordance with the provision of the collective bargaining agreement. We conclude that the action of the trial court was proper and we affirm.[1]

Plaintiff-appellee, NAPA Pittsburgh, Inc., is a corporation with its executive offices and principal place of business on Hamilton Avenue in Pittsburgh, Pennsylvania. Appellant, Local 926, represents approximately 54 of 110 employees at the Hamilton Avenue facility for collective bargaining purposes. A work stoppage occurred at this location as a result of the efforts of a second union, Local 110, to represent the employees of a company located in Altoona, Pennsylvania, doing business under the name of NAPA Altoona, Inc.[2] In order to promote its endeavors, Local 110 called a strike at the Altoona facility and began picketing there. For reasons that do not appear in the record, they decided to extend the picketing to the NAPA Pittsburgh building on Hamilton Avenue.

When this occurred, appellant, Local 926, informed its Hamilton Avenue members that they could refuse to cross Local 110's picket line. The union based this position on Article XIII of its collective bargaining agreement with appellee, which provides:

"It shall not be a violation of this Agreement . . . in the event an employee refuses to enter upon any property involved in a primary labor dispute or refuses to go through or work behind any primary picket lines . . . at the Employer's [NAPA Pittsburgh's] place or places of business."

As a result of this stand, a work stoppage occurred at the Hamilton Avenue facility.

NAPA Pittsburgh's response was to seek injunctive relief from the district court. The company argued that a question existed as to whether the picket line that Local 926 chose to honor was "primary" within the meaning of Article XIII, and contended that this issue was subject to the mandatory arbitration and no strike provisions contained in the collective bargaining agreement. The circumstances thus were alleged to bring the case within the *Boys Markets* excep-

---

1. After the appeal in this case was filed, appellee submitted a motion to dismiss that suggested the issue had become moot since Local 110 was no longer maintaining a picket line. This claim is without merit. Appellee posted a $5,000 bond to indemnify appellant for attorneys' fees and any injury suffered in the event it would be determined that the injunction was improvidently granted. Since appellant's right to indemnification depends upon a decision on the merits, the case is not moot. Liner v. Jafco, 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964).

2. The district court never determined the exact relationship between plaintiff-appellee NAPA Pittsburgh and NAPA Altoona. However, appellee concedes that NAPA Pittsburgh had "potential control" of NAPA Altoona (Brief of Appellee at 3) and at the hearing before the district court held September 7, 1973 appellee's attorney indicated his belief that the two companies had interlocking directorships and, in most cases, common officers (Appendix at 43a). Appellant asserts that the two are in fact a single company with headquarters at Hamilton Avenue in Pittsburgh. Clarification of this relationship would be important to determine the question of whether the picket line was primary or secondary.

tion to the anti-injunction provisions of the Norris-LaGuardia Act.[3]

After a hearing, the district court found that the employees' right to honor a picket line at the Hamilton Avenue plant was limited by the terms of the collective bargaining agreement and that the arbitration clause provided the compulsory method of resolving a dispute over the exercise of the privilege. Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L. Ed.2d 199 (1970) was held to be applicable, and a preliminary injunction was issued ordering that the work stoppage be ended and the parties begin arbitration of their differences.

■ In cases of this nature we start with the basic premise that the law favors arbitration of labor disputes. That there can be no doubt about this is clear from the pronouncements of the Supreme Court in the Steelworkers' Trilogy—United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S. Ct. 1347, 4 L.Ed.2d 1409 (1960); and United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The most recent reaffirmation of the policy may be found in Gateway Coal Co. v. United Mine Workers of America, et al., 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

■ Boys Markets, Inc. v. Retail Clerks Union, Local 770, *supra*, holds in essence that where a matter has been made arbitrable by the terms of a contract between the union and the company, an injunction may be issued to enforce this method of settling controversies between the parties. In determining whether a matter is arbitrable under the contract, any doubt should be resolved in favor of arbitration. United Steelworkers v. Warrior & Gulf Navigation, *supra*.

Here, the parties agreed to arbitrate ". . . any and all grievances, complaints or disputes arising between the employer and the union . . . ." The collective bargaining agreement also provided that it would not be a violation of the contract if an employee honored a primary picket line. Obviously then, it would be a breach of the agreement if the employees honored a picket line which was not primary.

■ The contractual provisions are clear but the parties disagree as to whether the picket line involved in this case was "primary." The union says that it was; the company denied it.[4] Both contend vigorously that they are correct. This is clearly a "dispute" and hence covered by the contractual requirement of arbitration.

3. The company here concedes that the NLRB has authority to secure an injunction against secondary picketing but contends that this does not deprive the employer of the right to seek an injunction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. We agree that this is a correct statement of the law. *See* Arnold v. Carpenters District Council, 417 U.S. 12, 94 S.Ct. 2069, 40 L.Ed.2d 620 (U.S.1974).

4. In his memorandum of September 11, 1973, the district judge wrote:
   "The testimony showed that Local 926 instructed its members that it would not be a violation of its contract if any of the members refused to enter upon the premises at 6550 Hamilton Avenue because this was a primary picket line and the contract specifically provided it would not be a cause for discharge or disciplinary action for an employee to refuse to enter the premises where there was a primary picket line." (Appendix at 49a)
   * * * * *
   "The alleged dispute in the instant case concerns the honoring of another union's picket line." (Appendix at 51a)
   During the hearing before the district court, counsel for the union also made clear that he was contending that the picket line was primary. (Appendix at 42a–45a)
   The record in the district court makes clear that the disagreement between the parties revolves around the pivotal issue of whether there was a primary picket line. *See* Boys Markets v. Retail Clerks Union, Local 770, *supra* at 237–38, 254, 90 S.Ct. 1583, 26 L.Ed.2d 199.

If it should be determined that a "primary" picket line was present at the plaintiff's plant, then unquestionably Local 926 could refuse to cross. If it was "secondary," then the company had the right to insist that the union honor its no strike agreement.

The union relies on the holdings of Amstar Corp. v. Amalgamated Meat Cutters & Butcher Workmen, 468 F.2d 1372 (5th Cir. 1972); General Cable Corp. v. International Brotherhood of Electrical Workers, 331 F.Supp. 478 (D. C.Md.1971); and Simplex Wire and Cable Co. v. Local 2208 of the International Brotherhood of Electrical Workers, 314 F.Supp. 885 (D.C.N.H.1970), but these opinions are clearly distinguishable. In none of the cited cases was there a contractual provision restricting the union's right to honor picket lines of other labor organizations. Indeed, the district court in the *Simplex* case, *supra,* specifically noted the omission of any reference to the subject in the contract between the parties in that case.

By way of contrast, the Court of Appeals in Monongahela Power Co. v. IBEW, 484 F.2d 1209 (4th Cir. 1973), held that an injunction could be issued to enforce a no strike clause in a contract even though it had no provision applicable to honoring a picket line of another union. In a later case, Pilot Freight Carriers v. Teamsters, 497 F.2d 311 (4th Cir. 1974), the same court sustained an injunction against a union honoring a picket line where the contract contained language similar to the one *sub judice,* and held that the matter was arbitrable.

■ We hold that determination of whether the picket line should be classified as primary or secondary was arbitrable under the terms of the contract

and pending resolution of the question Local 926 was properly enjoined from causing a work cessation. Requiring arbitration does not nullify the union's right to honor a primary picket line, but only suspends the exercise of the right until its existence is established by an arbitrator's decision. Undue delay should not be permitted since the district court has ample authority in the exercise of its equitable powers to see to it that arbitration proceeds promptly and expeditiously.

The order of the district court will be affirmed.

JAMES HUNTER, III, Circuit Judge, with whom SEITZ, Chief Judge, joins (dissenting):

The majority begins its discussion of the merits of the case by referring to "the basic premise that the law favors arbitration of labor disputes." It then goes on to emphasize one key point: that the dispute between the Company and Local 926—over whether Local 110's picket line is primary or secondary and thus whether Local 926's work stoppage is legal—is an arbitrable dispute. Our response is wholehearted agreement. The law does favor arbitration in this area, and the dispute over the nature of the Local 110 picket line *is* arbitrable. Moreover, we note that the district court found the issue to be arbitrable *and that the appellant Union does not dispute this finding.*[1]

We feel that this last point is of great significance in view of the position taken by the majority. Since everyone, including the appellant union, agrees that this issue is arbitrable, the majority's conclusion that the Company-Local 926 dispute is arbitrable, while undoubtedly correct, does not address itself to the is-

---

1. The appellant does argue at great length that the "underlying" dispute is not arbitrable. However, as it makes clear even in the initial statement of its first argument, the dispute that it refers to as the "underlying dispute" is the fight between the Company and Local 110 (Brief of appellant at 7). Since this dispute did not concern Local 926

in any way, it obviously was not arbitrable under the terms of Company-Local 926 collective bargaining agreement.

With regard to the Company-Local 926 dispute as to the legality of the Local 926 work stoppage, appellant's brief never takes issue with the district court's finding of arbitrability.

sue raised by appellant and therefore cannot resolve the question presented by this appeal.

Thus, we must begin with a formulation of the issue we are called upon to resolve. In our opinion that issue can be framed in the following way: given the fact that the issue as to the legality of the Local 926 work stoppage is arbitrable, should the district court be able to involve itself in this dispute by enjoining the work stoppage until an arbitrator can decide its legality?

One possible resolution of this question is to conclude that the federal courts can always intervene and issue an injunction against a strike whenever the resolution of an arbitrable dispute might end it.[2] This is the implicit conclusion of the majority. Since we feel this decision is not supported either by a reasoned balancing of the legal policies at stake or by the precedent, we dissent.

## I. POLICY CONSIDERATIONS

Once we get beyond the majority's discussion of the arbitrability of the primary-secondary issue, its decision rests primarily upon the Supreme Court's decision in *Boys Markets*.[3] Our disagreement with their holding comes down to a disagreement over the scope of the rule first enunciated in that case. However, we will defer our explanation of the *Boys Markets* holding until we have reviewed the policy impact of *Boys Markets* and contrasted it with the policy impact of the majority's decision in this case. We do this because we believe that the key to understanding the scope of the *Boys Markets* rule (and its lack of applicability here) lies in an understanding of its intended impact upon competing legal policies.

*Boys Markets* involved a dispute between an employer and union over the right of union employees to perform

certain tasks at the employer's store. This was a dispute that the Union, in its collective bargaining agreement, had agreed to resolve through the presentation of reasoned arguments to a neutral arbitrator, rather than through the use of economic force, i. e., by means of a strike. However, in that case, the union ignored both its no strike pledge and its agreement to arbitrate the issue and struck for the avowed purpose of forcing a favorable resolution to the arbitrable dispute. Thus, the union's actions made it clear that they did not intend to return to work until the Company conceded that the tasks involved had to be performed by union men.

Clearly, this strike had the effect of undermining the rule of law that favors the arbitration of labor disputes, since the strike was an attempt to force a union victory on the very issue that was made arbitrable not through the presentation of reasoned arguments to a neutral arbitrator, but rather through the use of sheer economic force. If the tactic had been successful, it would have settled the arbitrable dispute, making arbitration superfluous and thereby defeating the arbitrator's jurisdiction. Thus, the strike represented a plain attempt by the union to undermine and avoid its agreement to arbitrate the issue in dispute and the legal policy that favors the arbitration of labor disputes cut clearly in favor of having the district court issue an injunction to end the work stoppage.

However, the Court could not decide the case with a simple citation to this policy effect, for though the issuance of an injunction ordering an end to the strike plainly promoted arbitration, it just as plainly interfered with the clear policy directive of Congress contained in the Norris-LaGuardia Act, 29 U.S.C. § 104 (1970). That section in essence strips federal courts of the power to en-

2. Here, resolution of the arbitrable issue will end the work stoppage if the arbitrator rules in the Company's favor. Obviously, if the union wins, the work stoppage will continue.

3. Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

**326**

join strikes.[4] Faced with this clear conflict between two policies of law, the Supreme Court chose to create a "narrow"[5] exception to the anti-injunction provisions of the Norris-LaGuardia Act so that the court had the power to prevent the Union from· undertaking a course of conduct that was plainly designed to circumvent and defeat its explicit agreement to arbitrate.

In the instant case, the policy considerations that provide the *raison d'etre* for the *Boys Markets* decision are totally absent. Stated simply, while the policy enunciated in the anti-injunction provisions of the Norris-LaGuardia Act will be frustrated here just as it was in *Boys Markets* if an injunction is issued, the policy that favors the arbitration of labor disputes will in no way be undermined if the injunction requested here is denied.

In *Boys Markets* the strike was designed to pressure the Company into capitulating on the arbitrable issue before it could present its position to the arbitrator. In the present case, no similar situation exists. It is true that here, as in *Boys Markets,* there is a dispute that is clearly arbitrable—that is, the dispute over the nature of the Local 110 picket line and hence the legality of the Local 926 work stoppage. However, in this case, unlike *Boys Markets, the union's work stoppage is not designed to force settlement of this arbitrable issue before arbitration can take place; it is not an* *attempt to defeat the arbitrator's jurisdiction.*

We can state this conclusion without equivocation because of the undisputed facts in this case. Local 926 engaged in its work stoppage only because of the presence of Local 110's picket line. The work stoppage was not begun, nor was it continued, because of the union's disagreement with the Company over the arbitrable issue; that is, over its right to engage in a work stoppage. As a result, no concession that the Company could have made on this issue would have helped to end the walkout. That goal could be attained by the Company only if it resolved its dispute with Local 110 and thus caused that union to remove its picket line.

Since this is true, the work stoppage could have exerted no pressure upon the Company to give up its fight on the arbitrable issue and forego arbitration since resolution of the arbitrable dispute prior to arbitration would have brought nothing in return: the work stoppage would have continued in any event. Thus, the work stoppage placed no pressure on the' Company to forego arbitration.[6]

This fact makes the policy considerations operative here crucially different from those that were present in *Boys Markets.* In that case, the Court enjoined a strike that was specifically undertaken in order to force a resolution to the arbitrable dispute and therefore

4. "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
   "(a) Ceasing or refusing to perform any work or to remain in any relation of employment; . . . ." 29 U.S.C. § 104.

5. 398 U.S. at 253, 90 S.Ct. 1583, 26 L.Ed.2d 199.

6. If Local 926, after walking out in recognition of the Local 110 picket line, had said that the men would not return until the pickets were removed, *and also until the Company recognized their right to honor that picket line* under the collective bargaining agreement, then the situation would be different. Under these facts, it could fairly be said that the union was trying to prevail on the merits of the arbitrable issue by employing economic force rather than by employing reasoned arguments before a neutral arbitrator, and the work stoppage would then be an effort to resolve the merits of the dispute in a way that rendered the arbitrator's jurisdiction ineffective. At that point, we would be in the true *Boys Markets* situation and, under the holding of that case, the issuance of an injunction would be sustainable. However, as we note in the text, the facts of the present case are otherwise.

to circumvent arbitration; here, the work stoppage exerted no pressure on the Company to resolve the arbitrable issue short of arbitration.[7] As a result, while in *Boys Markets* the strike deterred the employer from pursuing arbitration, thus making it necessary to enjoin the strike in order to promote the policy favoring arbitration, no similar situation exists here. In this case, since the work stoppage does not pressure the Company to forego arbitration, the issuance of a *Boys Markets* injunction will do nothing to promote the arbitration of labor disputes and its issuance cannot be supported by the policy considerations that underlie *Boys Markets*.

However, one might object that while the factors we discuss above make it clear that the issuance of an injunction in this case will not promote arbitration in the same way that it was promoted by the injunction in *Boys Markets*, the majority's decision might still promote that goal by other means. We do not think that this suggestion can withstand analysis. In fact, in our opinion, the overall effect of the majority's decision is to actually *discourage* the arbitration of labor disputes.

If no injunction is permitted in this case, employers who in the future are placed in the situation faced by NAPA Pittsburgh will have every reason to seek arbitration since they will be able to end the work stoppage only by prevailing on the merits. However, if we affirm the district court and allow it to enjoin the work stoppage pending arbitration, employees in future cases will have everything to lose and nothing to gain from arbitration. Thus, we will be giving them every incentive to avoid and obstruct arbitration by every means at their disposal.

This unfortunate effect will occur because of the peculiarly limited role that the court plays in a case such as this. The district courts cannot look at the merits of these disputes since that is the province of the arbitrator. All they can do is review the circumstances of the case to see if an arbitrable issue exists and issue an injunction if the requirements of *Boys Markets* are met. As a result, the majority's interpretation of the *Boys Markets* holding creates a situation where an employer can end any work stoppage simply by going to the district court and *alleging* that under the terms of the collective bargaining agreement the work stoppage itself is illegal.[8]

The advantage that an employer enjoys in initiating this sort of proceeding, instead of pursuing arbitration of the merits is apparent. In arbitration he runs the risk of losing on the merits; before the district court no such risk exists since the merits are never reached. Thus, we can safely assume that employ-

---

7. One might object to this blanket statement by arguing that the work stoppage does discourage arbitration, indirectly, by pressuring the Company to settle its dispute with Local 110. If the company did, in fact, give in to this pressure, the pickets would be removed, the work stoppage would end, and resolution of the primary-secondary dispute would become totally irrelevant, thereby defeating the arbitrator's jurisdiction.

The fallacy in this argument lies in the assumption that resolution of the Company-Local 110 dispute would make an arbitrator's decision in the primary-secondary issue superfluous. This assumption is wrong for two reasons. First, the company, if correct on the merits, would still have a cause of action for the damages against Local 926, and would need the arbitrator's decision in order to pursue it. Second, if the Company wished to discipline or discharge any of the employees who engaged in the work stoppage the issue of its legality would also have to be arbitrated.

In the true *Boys Markets* situation the employer would not be free to pursue arbitration for these reasons since he would have already conceded on the arbitrable issue. Thus, his continued pursuit of arbitration would amount to a renunciation of his concession of the arbitrable dispute and would invite a renewal of the work stoppage.

8. Since issues arising out of differing interpretations of the terms of the collective bargaining agreement are arbitrable under most arbitration clauses, these allegations will be sufficient to elicit an injunction ending the work stoppage.

ers who in the future are faced with work stoppages similar to the one that faced the company in this case, will seek their initial relief in federal court rather than through arbitration.

Moreover, once the district court has issued its injunction, the employer will have everything he seeks, since the work stoppage will have been ended. As a result, he will no longer have anything to gain from arbitration.[9] On the other hand, arbitration might conceivably be very costly to him, since once the merits of the issue are reached, he will always run some risk of losing and a defeat on the merits would cause the injunction to lapse, raising the possibility of a renewal of the work stoppage. Thus, a rational employer will not only avoid initiating arbitration, he will use every means at his disposal to delay it as long as possible.

We think it is clear that a rule that gives one party every incentive for avoiding the arbitration will inhibit the smooth functioning of that procedure. As a result, it is our conclusion that the majority's opinion, rather than promoting the arbitration of labor disputes, will actually tend to discourage it.

We can see two objections that might be raised in an attempt to refute this conclusion. The first would concede that the issuance of an injunction here would discourage future employers from seeking or submitting to arbitration, but argues that the opposite result would only encourage equal recalcitrance on the part of the union. If this is true, it would obviously eliminate the negative policy impact we have outlined above. The second objection is raised by the majority and it also concedes (at least,

by implication) that the issuance of an injunction will make obstruction of arbitration useful from the employer's point of view. However, this argument then suggests that undue delay can be controlled by the district court through the use of its equitable powers.[10]

We do not believe that either of these arguments can withstand close scrutiny. With regard to the first, we think it is clear that the refusal to permit the issuance of an injunction in factual situations such as this would not place the union in a situation similar to that faced by the employer when an injunction can issue. As we have seen, if an injunction is issued, employers are given every reason to avoid and delay arbitration. However, if no injunction is issued, the union does not have the same incentive to seek delay for it will ultimately be liable in damages if it is, in fact, engaged in an illegal work stoppage. Thus, while obstruction and delay of the arbitration proceeding might permit the union to continue an illegal work stoppage for some period of time, this gain will only come at a significant cost since it would increase the union's monetary liability to the same extent.

As far as the second argument is concerned, it is true that the district court can use its equitable powers to seek to control undue delay. However, we do not feel that there is any reasonable way that a district court can use this power to prevent significant delay when that goal is sought by one of the parties.

In this case, for example, the employer can delay arbitration for nine days simply by using all of the time that is allotted to it at each step in the grievance procedures that leads to arbitration.[11] Moreover, this nine day

---

9. It is true that the company may eventually need a favorable decision on the merits if it wants to sue the union for the damage caused during the pre-injunction period when the strike was still in progress. However, since these damages can be collected many months after the event, the company can delay arbitration to the maximum extent possible and still not jeopardize its right to monetary relief.

10. As the majority opinion puts it, "Undue delay should not be permitted since the dis-

trict court has ample authority in the exercise of its equitable powers to see to it that arbitration proceeds promptly and expeditiously."

11. The relevant Article of the collective bargaining agreement reads as follows:
   "Article XI—Grievance Procedure
   "Any and all grievances, complaints or disputes arising between the Employer and the Union or any employee represented by

figure does not include the time that it will take for the Board established by the "Third" paragraph to deliberate on the matter, nor does it include the time needed (under the "Fourth" paragraph) to choose a neutral arbitrator, to bring the arbitration panel together, and to have the panel hear and decide the dispute. Obviously, these steps will use additional time in any event, and also provide a determined employer with further opportunities for stretching out the time needed to complete arbitration.

As a result, the employer will be able to delay the arbitration proceedings for at least several weeks, and throughout this period, the work stoppage will be enjoined. Since strikes like the present one are a response to specific disputes over which the union has no control, they are highly dependent upon timing for their success, and a minimum delay of this magnitude will render many of them ineffective. Thus, the incentive for the delay of arbitration by the employers, that is created by the issuance of an injunction in this case, cannot be effectively controlled by the district court's equitable powers.

Our conclusion therefore is that the Local 926 work stoppage did not have a negative impact, overall, on the goal of promoting the arbitration of labor disputes and that as a result the policy considerations that led to the creation of the *Boys Markets* rule do not support the issuance of an injunction in this case.

## II. THE HOLDING IN BOYS MARKETS

While our analysis of the policy considerations underlying *Boys Markets* leads us to the conclusion that an injunction should not issue in this case, we must still deal with the suggestion, implicit in the majority's holding, that the rule created in that case encompasses the factual situation presented here. If this is true, then policy considerations notwithstanding, the issuance of an injunction was permissible.

The majority characterizes the *Boys Markets* holding as follows:

"[Boys Markets] holds in essence that where a matter has been made arbitrable by the terms of a contract between the union and the company, an injunction may be issued to enforce this method of settling controversies between the parties."

If these words are meant literally then the majority has misapplied its own rule under the facts presented here. Both

the Union and covered by this Agreement shall be settled in the following manner:

"FIRST: All complaints or grievances shall be in writing and be filed by the grieving party within 48 hours, and shall be taken up by the Steward and the Employer or Representative of the Employer in the first instance and they shall endeavor to arrive at a settlement of the dispute within 48 hours.

"SECOND: Failing to agree, the shop Steward shall report the matter to the Union and the Union shall submit it in writing within three (3) days and attempt to adjust the same with the Employer within three (3) days.

"THIRD: Upon failure to agree and upon request of either the Union or the Employer, the matter shall be submitted within 48 hours to a Board made up of two (2) representatives selected by each party for the purposes of hearing and attempting to adjust the matter.

"FOURTH: In the event the matter cannot be adjusted by the method set forth above, or in case of any other disputes arising under this contract pertaining to its meaning or application, each party shall forthwith name one (1) arbitrator and the two (2) so chosen shall within forty-eight (48) hours name a neutral arbitrator. If the two do not agree upon a neutral arbitrator within 48 hours, the Director of the U.S. Mediation and Conciliation Service shall be requested to name a panel of five (5) suggested neutral arbitrators. The arbitrators named by the parties will then select the neutral arbitrator from such panel by each eliminating two of the arbitrators on the suggested panel submitted by the Director of the U.S. Mediation and Conciliation Service. The expense of the neutral, if any, shall be shared equally by the parties. Each party agrees to accept and abide by an award made by the majority of the Arbitration Board so constituted.

"FIFTH: There shall be no cessation of work during the pendency of the grievance proceedings."

parties agree that the "primary-secondary" issue is arbitrable and, as explained above, the union never tried to short circuit arbitration of that dispute by means of the work stoppage. As a result, there was no need to issue an injunction to "enforce this method of settling controversies between the parties," since there was never an attempt by the union to resolve the only arbitrable dispute by any other means.

However, since the majority affirms the issuance of the injunction, we assume that it reads the *Boys Markets* rule to permit the issuance of an injunction whenever arbitration might ultimately have the effect of ending a work stoppage.[12] We cannot agree with this expansive reading of the case. Not only does it run counter to the policy considerations that underlie the *Boys Markets* decision, it also ignores the language that carefully limits its holding.

As we noted earlier, in *Boys Markets* a dispute arose over the right of union employees to perform certain tasks at the employer's store and the union called a strike in an effort to force the Company to capitulate on that issue, despite the fact that it had agreed to seek resolution of this kind of dispute through the use of arbitration, rather than by means of a strike. Under these facts the Court held that since the strike was "*over* a grievance which both parties are contractually bound to arbitrate," 398 U.S. at 254, 90 S.Ct. at 1594 (emphasis added), an exception to the broad anti-injunction provisions of the Norris-La-Guardia Act was appropriate and an injunction could issue. In addition, it carefully spelled out the circumstances under which such an injunction could issue and emphasized the limited nature

of its decision by stating that, "[o]ur holding in the present case is a narrow one. We do not undermine the vitality of the Norris-LaGuardia Act." 398 U.S. at 253, 90 S.Ct. at 1594.

In our opinion, the import of this careful language is clear. An injunction can be issued to end a work stoppage only when an arbitrable issue is itself the "underlying cause" of the strike.[13] We reach this conclusion for three reasons. First, the Court in *Boys Markets* specified that a strike must be "over" an arbitrable dispute if it is to be enjoinable, and in our opinion a strike cannot be described as "over" a dispute unless that dispute is a cause of the work stoppage. Second, the *Boys Markets* decision is, by its own description a "narrow" one. Therefore it should logically be limited by the key factual circumstances that were present in the case. As a result, since the arbitrable dispute in *Boys Markets* (over the right of the union employees to perform the tasks involved) was also the underlying cause of the strike, this is logically a required part of the rule.

Finally, and of greatest significance, we reach this conclusion because, as we discussed at length in Part I of this opinion, a broader reading of the *Boys Markets* holding would extend it into areas where the policy considerations that dictated that decision simply do not operate. If the arbitrable dispute is not a "cause" of the work stoppage, then a concession on that dispute by the employer will not help to end the work stoppage. Under these circumstances, the work stoppage will exert no pressure on the employer to resolve the arbitrable issue short of arbitration. Thus, if this basic cause-effect relationship between

---

12. Here, arbitration would have ended the work stoppage if the company had prevailed on the merits of the dispute. However, if the union had prevailed on the merits then arbitration would have had no effect on the work stoppage.

13. As this Court stated in Parade Publications, Inc. v. Philadelphia, 459 F.2d 369 (3d Cir. 1972):

> "We read [Boys Markets] to indicate that arbitration should be encouraged by permitting judicial enforcement of a 'no-strike' clause when the *underlying issue* is arbitrable, but that there should be no injunction if the underlying dispute is not arbitrable." *Id.* at 374 (emphasis added.)

the arbitrable issue and the strike is not present, the strike will not discourage arbitration and the policy that favors the arbitration of labor disputes will not be furthered by the issuance of an injunction.

Applying this rule to the facts of the present case, it is clear that an injunction should not have issued. Here, the dispute that was the sole underlying cause of the Local 926 work stoppage was the fight between the Company and Local 110 that led to the creation of that union's picket line. This issue was plainly not arbitrable under Company-Local 926 collective bargaining agreement since it did not involve Local 926. Thus, though it caused the strike it provided no reason for the issuance of a *Boys Markets* injunction.

On the other hand, the dispute as to the nature of the Local 110 picket line

and thus as to the legality of the Local 926 work stoppage was arbitrable. However, this dispute was never an "underlying cause" of the Local 926 work stoppage since it arose after that work stoppage had begun and never became a basis for its continuation. As a result, the strike never deterred the arbitration of this issue and the existence of this dispute never provided a basis for the issuance of an injunction under the holding in *Boys Markets*.[14]

Before we close our discussion of the holding in *Boys Markets*, we must finally discuss its relationship to Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). While the majority never articulates the point, we believe that it is influenced by an unstated feeling that *Gateway Coal* has somehow expanded the *Boys Markets* exception to the anti-in-

14. We note that our interpretation of the scope of the *Boys Markets* decision and our conclusion that a *Boys Markets* injunction should not issue here finds direct support in cases that have been decided by the Fifth Circuit and several district courts on facts almost identical to those presented here. Amstar Corp. v. Amalgamated Meat Cutters, 468 F.2d 1372 (5th Cir. 1972); *see, e. g.,* General Cable Corp. v. Int'l Bhd of Elec. Workers, 331 F.Supp. 478 (S.Md.1971); Simplex Wire and Cable Co. v. Local 2208, Int'l Bhd of Elec. Workers, 314 F.Supp. 885 (D.N.H.1970); *but see* Monongahela Power Co. v. Local 2332, Electrical Workers, 484 F.2d 1209 (4th Cir. 1973).

The majority seeks to distinguish this precedent by stating that, "[i]n none of the cited cases was there a contractual provision restricting the union's right to honor picket lines of other labor organizations." However, we are constrained to note that the majority, in its attempt to distinguish these cases, has seized upon a factual difference that in no way supports its implicit conclusion that a *Boys Markets* injunction could be properly denied in the cited cases and still be issued here. In fact, the only conclusion that can sensibly be drawn on the basis of the factual difference noted by the majority is that if a *Boys Markets* injunction should be issued to end the strike here, then there is an even *stronger* reason for concluding that a *Boys Markets* injunction should have been issued in the cited cases.

It is true, as the majority notes, that the collective bargaining agreement in this case

contains a clause that was not contained in the agreements that were in operation in the cited cases. However, to characterize this additional clause as a restriction on the union's right to strike is misleading. Article XIII of the Company-Local 926 collective bargaining agreement does not *restrict* appellant's right to strike. Instead, it *enlarges* that right by creating an exception to the agreement's apparently all inclusive no-strike language. See the "Fifth" paragraph of Article XI, note 12, *supra*. This intent to "enlarge" the union's right to strike is apparent from the language of Article XIII itself:

"It *shall not be a violation* of this Agreement . . . in the event an employee . . . refused to go through or work behind any primary picket lines at the Employer's place or places of business." (Emphasis added).

In the cases cited, it is true that the agreements contained no clause similar to Article XIII. However, the agreement in each of these cases, like the agreement here, did contain an apparently all inclusive no-strike pledge. As a result, each of the unions in the cited precedent apparently had no right to strike at all, while in this case the union retained a limited right to strike that was arguably applicable under the facts of the case. Thus, the argument in favor of issuing a *Boys Markets* injunction to end the strike was stronger in the cited cases than it is in this case, and their denial of injunctive relief is *a fortiori*, in point here.

junction provisions of the Norris-La-Guardia Act in a way that is relevant here.

We do not believe that a careful reading of that opinion can support this conclusion. In *Gateway Coal*, a strike occurred because the employer attempted to reinstate two suspended foremen who the union felt would pose a safety hazard if allowed to resume their normal responsibilities.[15] The employer responded by seeking a *Boys Markets* injunction.

The right to obtain such an injunction in that case revolved around three key issues that were ultimately settled by the Supreme Court: 1) whether the issue in dispute was truly arbitrable; 2) whether the arbitration clause in the collective bargaining agreement gave rise to an implied no-strike obligation; and 3) whether the circumstances in the case satisfied the traditional equitable considerations that must also be met before a *Boys Markets* injunction can be issued. The Court answered each question affirmatively and concluded that a *Boys Markets* injunction should issue.

The first thing that should be noted is that in *Gateway Coal* the undisputed facts clearly established that the strike was caused by the "arbitrable" dispute over the work status of the two foremen. Thus, since the "underlying cause" requirement of *Boys Markets* was clearly satisfied, that case could not have *held* that that element was no longer a prerequisite to the issuance of a *Boys Markets* injunction.

Second, we can find nothing in the Court's discussion of the issues that were raised in *Gateway Coal* that would suggest that at some point in the future it is likely to hold that the "underlying cause" requirement of *Boys Markets* is no longer operative. As we have noted, this requirement was established in order to limit the availability of *Boys Markets* injunction to those cases in which the work stoppage has the effect of undercutting the arbitration of labor disputes. As a result, as long as the promotion of the arbitration of labor disputes remains the policy rationale that justifies the issuance of *Boys Markets* injunctions, the "underlying cause" requirement will logically remain an integral part of the rule.

We can find nothing in the *Gateway Coal* decision that suggests that this policy goal has been or will be changed. The Court's discussion of the arbitrability of the safety dispute involved in the case, and its discussion of the traditional requirements of equity deal with the existence of additional factors that are plainly required before an injunction can issue under the holding in *Boys Markets*. Its conclusion that these prerequisites were met can support no inference that the underlying policy rationale of the *Boys Markets* rule has been changed or expanded.

The rest of the opinion addresses itself to the question of whether the union's agreement to arbitrate the dispute must be reinforced by an explicit agreement not to strike in order for a *Boys Markets* injunction to issue. The Court concludes that an explicit no-strike clause is not needed since the agreement to arbitrate a dispute implies, in the normal case, a corresponding agreement not to seek its resolution through a strike.

It is true that this part of the *Gateway Coal* opinion does expand the *Boys Markets* holding, since it permits courts to enjoin strikes in the absence of explicit no-strike agreements. However, this extension of the rule in no way changes the policy rationale of *Boys Markets*. On the contrary, it only provides for its logical extension since it allows the district courts to enjoin strikes that undercut agreed upon arbitration regardless of whether those strikes are

---

15. These foremen had been suspended from their jobs because they had neglected to make a safety check they were responsible for making and, as a result, had unnecessarily subjected the men to a dangerous condition.

also explicitly barred by the terms of the collective bargaining agreement.

As a result, nothing in *Gateway Coal* in any way suggests a change in the underlying policy rationale that justifies the *Boys Markets* rule. It is still designed to end strikes if, but only if, they have the effect of undercutting agreed upon arbitration. Since this is true, we can only assume that the "underlying cause" requirement will remain a necessary prerequisite to the issuance of a *Boys Markets* injunction.

### III.  CONCLUSION

As we stated at the outset, our disagreement with the majority boils down to a dispute as to the meaning of *Boys Markets*. In our opinion, the holding in that case permits the issuance of injunctions to end work stoppage only when an arbitrable dispute is an underlying cause of the strike.

We reach this conclusion, in part, because of the language used to state the holding in that case. However, we are primarily persuaded by our understanding of the policy considerations that underlie that decision. In *Boys Markets* the court was faced with a dilemma. On the one hand, it was obliged to give effect to the policy judgment that is embodied in the anti-injunction provisions of the Norris-LaGuardia Act by refusing to issue an injunction. On the other, it was equally obliged to enjoin the strike since its clear effect was to undercut the policy that favors the promotion of arbitration of labor disputes. Under these special circumstances, it ruled that an injunction could issue.

It is important to note that the Court's goal was not to end the strike.[16] Instead, its sole purpose was to promote the arbitration of the labor dispute involved by eliminating a serious impediment to that goal. Thus, its rule sensibly permits the enjoining of strikes only

when they have the effect of interfering with agreed upon arbitration. As we have noted, a strike can have this effect only when it is caused by the dispute that is supposed to be arbitrated, since only under those circumstances will the strike pressure the employer to capitulate on the arbitrable dispute and therefore forego its arbitration.

Once this "underlying cause" requirement is accepted as an integral part of the *Boys Markets* rule, its application to the facts of this case is mechanical. Here, the underlying cause of the strike was not arbitrable (and the only dispute that was arbitrable was not a cause of the work stoppage). Thus, the work stoppage was not an attempt to force the company to capitulate on the arbitrable dispute and forego arbitration, and the district court erred in enjoining the work stoppage.

ADAMS, Circuit Judge (dissenting):

Judge Hunter's thoughtful and comprehensive opinion reflects to a large extent my own views with respect to the issues presented by this appeal. However, although Judge Hunter, in discussing Boys Markets, Inc. v. Retail Clerks Local 770,[1] does advert to the fundamental jurisprudential principle that courts are to interpret laws and to permit policy considerations to infect their decisions only within statutory interstices, he does not appear to accord that principle the same weight I would in reaching the conclusion that a *Boys Markets* injunction is not appropriate in the circumstances here.

Analysis of the scope of the *Boys Markets* decision must encompass an appreciation of the widespread abhorrence of the labor injunction that existed at the time of the enactment of the Norris-LaGuardia Act.[2] Many viewed the injunction as the principle weapon of those antagonistic to the emerging labor

16. Indeed, it did this most reluctantly in view of the anti-injunctions provisions of the Norris-LaGuardia Act.

1. 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

2. *See generally* Frankfurter & Green, The Labor Injunction (1930).

movement. Some courts, it was felt, employed the injunction to effectuate their own policy predilections, predilections that did not attach substantial significance to the interests of the working man. In response to these sentiments, Congress enacted the Norris-LaGuardia Act. The Act expressly deprived the federal courts of jurisdiction to issue labor injunctions in almost all circumstances.[3]

Subsequent developments, however, seemed to temper somewhat the posture of judicial abstention imposed by the Norris-LaGuardia Act. In 1947, Congress enacted Section 301(a) of the Labor-Management Relations Act which, by its terms, permits suits for violations of collective bargaining agreements to be brought in federal courts. In Textile Workers Union v. Lincoln Mills,[4] the Supreme Court, in reversing the district court's refusal to compel the employer to arbitrate pursuant to the collective bargaining agreement, held that Section 301(a) calls upon the federal courts to fashion a federal substantive labor law.

*Lincoln Mills* and the *Steelworkers Trilogy*,[5] which followed three years later, made it apparent that the cornerstone of this judge-made labor law was to be a policy favoring the operation of the arbitral process in resolving labor-management disputes. Inevitably the Supreme Court was faced with the request of an employer, relying on this federal policy favoring arbitration, to enjoin a strike over an arbitrable grievance. The union, of course, interposed the express prohibition against such an injunction contained in the Norris-LaGuardia Act. In 1962, the Court, in

Sinclair Refining Co. v. Atkinson,[6] held that the Act precluded the issuance of the injunction.

But eight years later, in *Boys Markets*, the Supreme Court reconsidered *Sinclair*. This reconsideration was prompted in part by the "anomalous" situation created when some employers seeking injunctive relief in state courts, which were not subject to limitations like those of the Norris-LaGuardia Act,[7] were frustrated in their attempts by the unions' removal of the cases to federal courts. Such federal courts proceeded to vacate the state court injunctions on the basis of the Act. The Court overruled *Sinclair* and, as Judge Hunter notes, made a "narrow" exception to the Norris-LaGuardia Act. In so doing, the Court "accommodated" the Act to the federal policy favoring arbitration by permitting an injunction in the carefully circumscribed situation that exists when a work stoppage is over an arbitrable grievance. The Court, nevertheless, emphasized that with its opinion in *Boys Markets* it did "not undermine the vitality of the Norris-LaGuardia Act." [8]

In light of this historical backdrop, it is necessary to approach cases appearing to hover near the parameters of the *Boys Markets* exception to the Norris-LaGuardia Act with an understanding that *Boys Markets* itself may represent the judiciary's most ambitious foray into an area seemingly pre-empted by statute. Absent a clear signal from the Supreme Court, doubts should be resolved in favor of the applicability of the Norris-LaGuardia Act. When viewed from this perspective, Judge

3. *Cf.* United States v. UMW, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

4. 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

5. United Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) ; United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ; United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

6. 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962).

7. At the time of *Boys Markets*, "about one-half of the States [had] enacted so-called 'little Norris-LaGuardia Acts' . . . ." However, "in only about 14 jurisdictions [was] there a significant Norris-LaGuardia-type prohibition against equitable remedies for breach of no-strike obligations." 398 U.S. at 247–248 n. 15, 90 S.Ct. at 1591.

8. 398 U.S. at 253, 90 S.Ct. at 1594.

Hunter's analysis is, in my judgment, particularly persuasive.

It may be suggested that Gateway Coal Co. v. United Mine Workers [9] constitutes a direction by the Supreme Court for federal courts to exercise less circumspection than the language of *Boys Markets* would seem to indicate in issuing injunctions in circumstances such as those here. The basis of such a suggestion, so the argument seems to go, is the Court's willingness to imply a no-strike obligation when the collective bargaining agreement did not contain an *express* no-strike provision. However, in Teamsters Local 174 v. Lucas Flour Company,[10] a damage action, the Supreme Court, eight years prior to *Boys Markets*, implied a no-strike clause coextensive with the arbitration provision. Therefore, in light of the well-established *Lucas Flour* precedent, the implication of a no-strike clause in the context of a suit to secure a *Boys Markets* injunction was not particularly surprising, and, therefore, cannot be said to amount to a signal to relax the rather strict preconditions placed on the issuance of a labor injunction by the *Boys Markets* decision and set out with specificity by Justice Brennan.[11]

Accordingly, for the reasons so well expressed by Judge Hunter plus those set forth above, I respectfully dissent.

9. 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

10. 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962).

11. 398 U.S. 253–255, 90 S.Ct. 1583, 26 L.Ed. 2d 199.