**PLAIN DEALER PUBLISHING COMPANY, Plaintiff-Appellant,**

v.

**CLEVELAND TYPOGRAPHICAL UNION # 53 et al., Defendants-Appellees.**

No. 75–1219.

United States Court of Appeals, Sixth Circuit.

Aug. 15, 1975.

James P. Garner, Elliott S. Azoff, Victor Strimbu, Jr., Don H. Pace, Baker, Hostetler & Patterson, Cleveland, Ohio, for plaintiff-appellant.

Norton N. Newborn, Melvin S. Schwarzwald, Metzenbaum, Gaines & Stern Co., LPA, Mark A. Rock, James L. Oakar, Cleveland, Ohio, for defendants-appellees.

Before PECK, McCREE and MILLER, Circuit Judges.

PER CURIAM.

This is an appeal from the denial of an injunction requested in a dispute between the Cleveland Plain Dealer and the craft unions representing some of its employees. It requires us to decide whether the exception to the anti-injunction provision of the Norris-LaGuardia Act, 29 U.S.C. § 104, carved out in *Boys Market, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), permits an injunction against unions engaged in a work stoppage in deference to another union's lawful picket line. We hold that it does not.

The Cleveland Newspaper Guild, not a party to this litigation was engaged in a lawful economic strike against the Plain Dealer in November, 1974, and members of the defendant unions did not cross the Guild picket lines. Mass picketing and incidents of violence attended the Guild strike, and a state court order limiting the number of pickets was not totally effective. Although members of two of the four defendant unions did attempt to report for work, they were unable to enter the Plain Dealer building because of the persistent violence.

The Plain Dealer brought suit in the district court to enjoin the work stoppage by the craft unions and to force them to arbitrate the dispute. The district court, in denying the motion for injunctive relief, stated that the narrowly circumscribed injunctive relief authorized in *Boys Market* did not extend to the prohibition of work stoppages generated by lawful labor disputes; that neither the violence nor the threats of violence on the Guild picket line violated the Guild-Plain Dealer collective bargaining agreement; and that equitable considerations favored the denial of the motion for the injunction. After the district court issued its order, the United States Court of Appeals for the Second Circuit considered the issue before us. In *Buffalo Forge Co. v. United Steelworkers of America*, 517 F.2d 1207 (1975), it determined that when members of a union not directly in conflict with an employer conduct a work stoppage out of respect for another interested union's lawful picket line, and not because of a desire to avoid arbitration,

the denial of injunctive relief accords with the national labor relations policy expressed in the Norris-LaGuardia Act.

For the reasons set forth in the *Buffalo Forge* decision and for the reasons set forth in the district court's opinion, attached hereto as an appendix, the judgment is affirmed.

## APPENDIX

## MEMORANDUM

(Filed November 8, 1974)

BEN C. GREEN, J.:

This action was commenced on Friday, November 1, 1974, by the Plain Dealer Publishing Co. (hereinafter Plain Dealer) against three unions and the officers thereof in their official capacities. The union defendants so named were Cleveland Typographical Union, No. 53 (hereinafter Printers), Cleveland Stereotypers Union, No. 22 (hereinafter Stereotypers), and Cleveland Mailers' Union, No. 12 (hereinafter Mailers). The complaint alleged the existence of continuing collective bargaining agreements between plaintiff and each of the said defendants, which contracts contained clauses obligating the parties thereto "to settle all differences that may arise between the parties" by conciliation or grievance procedures "and final and binding arbitration." The complaint further alleged the existence of a dispute between plaintiff and each of the said defendants, in that each of the defendant unions had an obligation to provide workers for duty at the Plain Dealer, but that as of November 1, 1974, each of the unions:

. . . indicating it was speaking for and on behalf of itself and its members indicated it would not supply the necessary men and cause them to report for work on their regularly scheduled shifts.

It was further alleged that the said disputes were arbitrable under the contracts, but that the defendants, nevertheless, "have caused a work stoppage in violation of the Agreement".

The relief sought under the complaint was:

1) A preliminary injunction enjoining the work stoppage.

2) A decree that the collective bargaining agreements preclude a work stoppage during their terms and that the disputes alleged were subject to arbitration thereunder.

3) A finding that defendants were in violation of the agreements by failing to cause their members to report for work.

4) A permanent injunction against the work stoppage.

5) Retention of jurisdiction to enforce the injunctive orders and for determination of damages.

6) Recovery of fees, expenses, cost and disbursements of the action.

There was presented to the Court, with the complaint, a motion for temporary restraining order. Such motion sought an order upon defendants prohibiting the continuing of "their unauthorized strike now existing at the Company's plant". When counsel for plaintiff appeared with that request, counsel for defendant Printers was also present. The Court was advised that the factual background for the litigation was that The Cleveland Newspaper Guild Local No. 1 (hereinafter Guild) was engaged in a lawful economic strike against the Plain Dealer as of November 1, 1974, and that members of the defendant unions had not crossed the Guild picket lines which had been set up at 6:00 a. m. that morning. However, counsel for the Printers advised the Court that the failure to report for work by his clients was not voluntary, in that there was mass picketing at the Plain Dealer plant, with threats of harm and violence to anyone attempting to gain entry. Plaintiff's counsel then advised that within the hour an order had been obtained in the Common Pleas Court of Cuyahoga County limiting the number of pickets permitted and prohibiting any interference

with rights of others. He conceded, however, that it was not known whether such order had yet been served and what the actual conditions were at that time.

Based upon such representations the Court advised that the requested order would not be granted, but that action would be withheld until it was determined what conditions developed at the Plain Dealer premises following service of the Common Pleas order. The Court also advised that if necessary further proceedings could be had on Saturday.

A request for a Saturday hearing was made by plaintiff's counsel, and the same was convened at about 3:00 p. m. At that time plaintiff filed an amended complaint, adding as a party defendant the Cleveland Newspaper Printing Pressmen's Union No. 5 (hereinafter Pressmen) and the officers thereof in their official capacities. The allegations of the amended complaint as against the Pressmen were essentially the same as against the other defendants. A further motion for temporary restraining order against all defendants was presented. That proposed order was similar to the original request for temporary restraining order, but contained an added clause that:

> . . . nothing contained herein shall be construed as requiring any individual employee member of the defendant Unions who, upon attempting to enter the plaintiff's premises, is unable to do so because of real fear of bodily harm to himself from the pickets of the Cleveland Newspaper Guild Local No. 1.

Plaintiff's counsel advised that the Common Pleas order had been served shortly after 6:00 p. m. the preceding evening, that he believed it was then possible for the members of the craft unions to obtain entrance to the Plain Dealer Building, but that no members of the four defendants unions had reported for work.

Defendants' counsel, on the other hand maintained that notwithstanding the Common Pleas order conditions at the premises were still such that the craft employees were being denied access to the plant, and that there existed a real danger to the safety of any person who might try to cross the Guild picket line.

Faced with such conflicting representations by counsel, the Court set the matter for evidentiary hearing on Monday, November 4, 1974. On Tuesday, November 5, it was agreed that the matter would be considered as a motion for preliminary injunction upon the pleadings then before the Court. Such decision was reached based upon the extent of the record being developed and in order to afford appellate review from this Court's determination.

The hearing having been concluded, and the Court having received briefs from counsel during the progress thereof, the matter is before the Court for decision.

■ At the outset, it must be borne in mind that this is a motion for preliminary injunction. As such, the criteria pertinent thereto are not the same as control on a decision on the merits. The standards which this Court should apply in determining whether a preliminary injunction is proper have been set forth in *North Avondale Neighborhood Association v. Cincinnati Metropolitan Housing Authority*, 464 F.2d 486 (CA 6, 1972), as follows:

1) Has petitioner made a strong showing of probable success at trial?

2) Has petitioner shown irreparable injury?

3) Would issuance of the preliminary injunction cause substantial harm to others?

4) Where lies the public interest?

Further, a determination made on a request to invoke the Court's equitable powers involves consideration of factors beyond those which apply to a prayer for remedies at law. It is also important to note that this is an action against the unions themselves for concerted activity, and does not involve determination of action by any particular individual in-

volved, except insofar as such conduct bears on the question of concerted activity.

In determining whether plaintiff has made a strong showing of probable success on the merits, the Court must consider the law controlling herein, and the application of such legal principles to the evidence upon the record.

The starting point for a discussion of the legal issues raised in this case should be the Supreme Court's decision in *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). In fact, the injunction being sought by plaintiff is of a nature now commonly referred to as a "Boys Market" injunction, and has been so designated in the course of this proceeding. Before the landmark *Boys Markets* decision, federal courts could not enjoin a strike, even in breach of a no-strike contractual obligation, in any case arising from a labor dispute, because of the all-encompassing language of the anti-injunction provisions of Section 4 of the Norris-LaGuardia Act. 29 U.S.C. § 104. In *Boys Markets*, however, the Supreme Court carved out a "narrow exception" to the Norris-LaGuardia Act in order to accommodate the Act to § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), and the federal labor law policy which encourages arbitration as a method for settling disputes.

In *Boys Markets*, the union insisted that only its members and not supervisory personnel could rearrange merchandise in the frozen food cases of the employer's market. When the employer refused to empty the shelves stocked by non-union employees, the union went out on strike. The dispute was subject to arbitration under the collective bargaining agreement and the strike was in violation of an express no-strike clause of that agreement. The Supreme Court held that the district court had properly enjoined the strike, stating that under § 301(a) the federal courts may enjoin a strike if it is found that the "strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate . . ." and that the injunction is warranted under normal equity considerations. The Supreme Court's holding is reflected in the following portion of its opinion:

Our holding in the present case is a narrow one. We do not undermine the vitality of the Norris-LaGuardia Act. We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure. Nor does it follow from what we have said that injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance. The dissenting opinion in Sinclair suggested the following principles for the guidance of the district courts in determining whether to grant injunctive relief—principles that we now adopt:

"A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." 370 U.S., at 228, 82 S.Ct., at 1346, 8

L.Ed.2d, at 460. (Emphasis · in original.) 398 U.S. 235, 253–254, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199.

In *Boys Markets*, there was an express no-strike provision in the collective bargaining agreement. It was this express contractual duty which the Supreme Court held could be enforced by an injunction under § 301(a) of the Labor Management Relations Act. In a subsequent ruling, the Court has further held that an implied no-strike clause will also support a *Boys Market* injunction. *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). In *Gateway* the Court noted that "a contractual commitment to submit disagreements to final and binding arbitration gives rise to an implied obligation not to strike over such disputes." *Id.*, at 381. The Court further stated that "the agreement to arbitrate and the duty not to strike should be construed as having coterminous application." *Id.* at 382, 94 S.Ct., at 639.

Although *Boys Markets* is of relatively recent origin, there are a number of cases involving its application to fact situations similar to that before the Court.

It appears to the Court that while many of the decisions may be distinguishable on their precise facts, they do present two basically different jurisprudential views as to the proper construction and reach of *Boys Markets*.

On the one hand, there are a number of decisions which hold that a refusal of union members to cross a picket line established at their place of employment by another union is not enjoinable. The leading case representing that view is *Amstar Corp. v. Amalgamated Meat Cutters and Butcher Workmen of North America*, 468 F.2d 1372 (CA 5, 1972). Therein the Court stated:

The case *sub judice* is entirely outside the scope of the exception to the Norris-LaGuardia Act delineated in *Boys Markets*. [Citations omitted] The strike by the Chalmette employees was not "over a grievance" which the parties were contractually bound to arbitrate. Rather, the strike itself precipitated the dispute—the validity under the Union's no-strike obligation of the member-employees honoring the ILA picket line. Were we to hold that the legality of the very strike sought to be enjoined in the present situation constituted a sufficiently arbitrable underlying dispute for a *Boys Markets* injunction to issue, it is difficult to conceive of any strike which could not be so enjoined. The *Boys Markets* holding was a "narrow one," not intended to undermine the vitality of the anti-injunction provision of the Norris-LaGuardia Act. Indeed, the Supreme Court specifically stated that its decision did not mean "that injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance." This appeal is such a case. The district court was without jurisdiction to enter the injunction. *Id.*, at pps. 1373–74.

The same theory was stated much more succinctly in *General Cable Corporation v. International Brotherhood of Electrical Workers, Local Union 1644*, 331 F.Supp. 478 (D.Md., 1971), wherein the Court stated:

The only grievance or dispute between the Company and Local 1644 is the result of the strike and not the cause of the strike. It does not come within the narrow exception created by the rule in *Boys Market* to the applicability of the Norris-LaGuardia Act. *Id.*, at p. 482.

The same conclusion was reached in *Simplex Wire and Cable Co. v. Local 2208, International Brotherhood of Electrical Workers*, 314 F.Supp. 885 (D.N.H., 1970).

Although not directly in point, in that it does not involve a refusal to cross picket lines, the decision in *Parade Publications, Inc. v. Philadelphia Mailers Union No. 14*, 459 F.2d 369 (CA 3, 1972), warrants mention. Therein union defendants having a no-strike and arbitration clauses in their contracts had engaged in a work stoppage in protest of

the employer's alleged setting up of a new concern to which the work being performed by the union members would be diverted. In reversing a Section 301 injunction, the court stated:

Parade's argument that the strike itself clearly created an arbitrable issue of whether the union had violated the general "no strike" clause does not require a different result for two reasons. First, it is apparent from the court's reference to "any dispute which underlies the alleged walkout" that it did not rest its decision to issue an injunction upon a finding that the strike itself created an issue which the parties have bound themselves to arbitrate. Second, this argument of Parade goes beyond anything decided in the *Boys Market* case. Indeed, if the Diversified situation caused the strike and does not present an issue which the parties have bound themselves to arbitrate, it would run contrary to the rationale of *Boys Market* to grant Parade an injunction. *Id.*, at p. 374.

The contrary point of view proceeds from a line of authority represented by *Monongahela Power Company v. Local No. 2332, International Brotherhood of Electrical Workers*, 484 F.2d 1209 (CA 4, 1973). In that decision, although stating that:

The anti-injunction provision of Norris-LaGuardia still retained much of its vitality after *Boys Markets*, however, as the Court specifically limited its holding—that injunctive relief against labor disputes may be available—to a narrow fact situation,

the court found that by virtue of the "extremely broad and encompassing language" of the express no strike-no lockout and grievance-arbitration clauses of the collective bargaining agreement "the facts of the instant case clearly bring it within the narrow *Boys Markets* exception". The Fourth Circuit again upheld a *Boys Markets* injunction in a picket line situation in *Pilot Freight Carriers v.*

*International Brotherhood of Teamsters Chauffeurs, Warehousemen and Helpers of America*, 497 F.2d 311 (1974). The decision therein was predicated upon the fact that the collective bargaining agreement, which contained an express no-strike clause and a broad arbitration clause, had a clause which granted the union the right to refuse to cross a primary picket line. The court found that a dispute existed as to whether the picket line was primary or secondary and that the "relationship between the no-strike clause and the clause allowing individual employees to refuse crossing a primary picket line" was an arbitrable matter within the sense of *Boys Markets*. In *NAPA Pittsburg, Inc. v. Automatic Chauffeurs, Parts and Garage Employees, Local Union 926*, 502 F.2d 321 (CA 3, 1974), the court was also presented with a collective bargaining agreement containing a clause granting employees the right to refuse to cross a primary picket line. The decision therein was en banc, with a 6-3 vote affirming the granting of a § 301 injunction. The majority distinguished the *Amstar* line of authority on the basis that "In none of the cited cases was there a contractual provision restricting the union's right to honor picket lines of other labor organizations", while the dissent took the view under the rationale of *Boys Markets* that an injunction should not be granted in the factual context presented. In *Barnard College v. Transportation Workers Union of America*, 372 F.Supp. 211 (S.D.N.Y., 1974), the court based its injunction upon a contractual commitment to resolve "all differences" by arbitration with an obligation not to "call or countenance any form of strike", while in *Bethlehem Mines Corporation v. United Mine Workers of America*, 3 Cir., 494 F.2d 726, a contract clause obliging the parties to arbitrate all differences under the contract and any differences "about matters not specifically mentioned in this agreement, or . . . any local trouble of any kind . . . at the mine" was sufficient to support a *Boys Market* injunction.

The uncertain state of the law on the issue before the Court is clearly brought home by the fact that within one week of each other two district courts reached conflicting conclusions on essentially the same facts and law as were later presented to the Fourth Circuit Court of Appeals in *Pilot Freight, supra.* On March 25, 1974, Judge O'Kelley of the Northern District of Georgia entered a § 301 injunction, applying the same theory adopted by the Fourth Circuit in its later decision. *Pilot Freight Carriers, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 4 Cir., 497 F.2d 311. On April 1, Judge Stern of the New Jersey district denied an injunction sought on the same grounds as had been advanced in Georgia, adopting the view of *Boys Markets* contained in the *Amstar* line of authority. *Pilot Freight Carriers, Inc. v. Local 560, International Brotherhood of Teamsters,* D.N.J., 373 F.Supp. 19. Similarly, although the court sought to distinguish the ruling in the Maryland *General Cable* case, it appears to the Court that the decision in *General Cable Corporation v. International Brotherhood of Electrical Workers, Local Union 1798,* 333 F.Supp. 331 (W.D.Tenn., 1971), simply represents a different conclusion on basically the same facts in each case.

Having reviewed the considerations discussed in what this Court believes to be the two divergent lines of authority, this Court is of the opinion that the conclusion of the *Amstar* case is the sounder view.

■ In this Court's opinion, there is a clear difference between a labor dispute which results from a work stoppage and a work stoppage which is the result of a labor dispute arising from conditions of employment. While *Boys Markets* teaches that the latter is enjoinable, the Court believes that an injunction as to the former cannot be reconciled with the express language of the Supreme Court

in that decision. In this Court's opinion, the philosophy represented by the *Monongahela Power, NAPA,* and *Pilot Freight* decisions runs counter to the Supreme Court's admonition that the *Boys Markets* holding was a "narrow one", not making injunctive relief "appropriate as a matter of course in every case of a strike over an arbitrable grievance", and that the decision was not intended to "undermine the vitality of the Norris-LaGuardia action", but rather represented an accommodation of the literal terms of Section 4 of Norris-LaGuardia to the provisions of Section 301(a) of the Labor Management Relations Act and the judicial policies favoring arbitration of labor disputes. 398 U.S. 235, 250, 253–254, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199. In this case, there was no dispute whatsoever between plaintiff and defendants until such time as the craft employees failed to report for work following posting of the Guild picket lines. It therefore follows that no injunction may issue herein against these defendants.

Although the Court's decision as expressed above is determinative of the plaintiff's motion, as previously stated, the Court intends to cover all issues presented in this proceeding. Consequently, assuming that this Court has too narrowly viewed *Boys Markets* and that the theory of the *Monongahela Power, NAPA* and *Pilot Freight* decisions applies, the Court will now consider the remaining issues. This is done so that in the event of an appeal, should the Court of Appeals disagree with this Court's view of the law, it will not be necessary to remand the action for further findings.

■■ In considering the remaining issues, which are matters of both fact and law, the burden of proving its case rests upon the plaintiff. An employer seeking an injunction has the burden of proving that he comes within the *Boys Markets* doctrine. He must provide the Court with an evidentiary basis for making the findings required by that case as a pre-

requisite to the issuance of an injunction. *Parade Publications, Inc. v. Philadelphia Mailers Union Local No. 14*, 459 F.2d 369, 373 (CA 3, 1972). While in a proceeding for preliminary injunction a plaintiff need not prove its case to the same degree as would be required at a trial upon the merits, the record must reflect sufficient evidence of the factors required to support a *Boys Markets* injunction to satisfy the "strong showing of probable success" test.

█ In order to satisfy its burden, plaintiff must demonstrate that the unions are in fact engaged in an unlawful work stoppage, that such work stoppage is over a grievance that the parties are contractually bound to arbitrate, and that the collective bargaining agreements contain no-strike clauses, express or implied, which afford a basis for an injunctive order. *Avco Corp. v. Local Union # 787 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America*, 459 F.2d 968, 972 (CA 3, 1972).

The first issue is whether these defendants are now engaged in an unlawful work stoppage. If they are not, then no injunction could issue.

██ We must start with the premise that a person who refuses to cross a picket line of another union as a matter of principle becomes a striker, but that one who refuses to do so by reason of physical fear does not act on principle and may not be considered a striker. *National Labor Relations Board v. Union Carbide Corporation*, 440 F.2d 54 (CA 4, 1971). *See also, National Labor Relations Board v. Knight Morley Corp.*, 251 F.2d 753 (CA 6, 1958). This principle has been codified in § 502 of the Labor Management Relations Act, 29 U.S.C. § 143, which provides:

> [N]or shall the quitting of labor by an employee or employees in good faith because of abnormally dangerous conditions for work at the place of employment of such employee or employ-

ees be deemed a strike under this chapter.

This recognition of a right to refuse to work provides a limited exception to an express or implied no-strike obligation. *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

While the express terms of § 502 would appear to apply to occupational safety hazards, it has been construed as extending to potential labor violence. *Redwing Carrier, Inc.*, 130 N.L.R.B. 1208, enforced as modified, 117 U.S.App.D.C. 84, 325 F.2d 1011 (1963). Therefore, whether failure to report to work in the face of credible threats of violence be characterized as protected activity under § 502 or as not representing a breach of contract, the result is the same—there is no basis for an injunction mandating a return to work.

In this case there is a dispute between the parties as to whether the defendants have failed to report for work as a consequence of a bona fide fear for personal safety. This is a matter of fact which the Court must resolve.

The Court finds that the facts are not the same as to all defendants.

Approximately a week before the Guild went on strike, the possibility of that even was discussed at a Printers' union meeting, and the membership was advised that they would be obliged to continue working.

On the evening that the Guild strike vote was taken, the craft unions held a unity meeting at which the question of supporting the Guild strike was presented. All unions present, excepting the Pressmen and Mailers, voted to cross the picket lines and report for work if possible. The Pressmen and the Mailers abstained on the basis that they required instructions from their international unions.

Members of both the Printers and Stereotypers have attempted, either individually or collectively, to obtain entry into the Plain Dealer plant. The record

reflects that in each instance they have been met with resistance and threats of violence. When a large body of Printers attempted to report on Sunday, November 3, they were met by an equally large body of strikers barring their way.

Plaintiff's Director of Labor Relations testified that he believed the threats to be idle ones, and there has been the strong intimation by plaintiff that the Sunday mass confrontation was a neatly arranged scenario. The members of the defendant unions who testified stated they fully believed the threats, and honestly believed that violence would have ensued had they attempted to pass those barring their way.

It has been said that:

What constitutes unlawful intimidation depends on all the circumstances. Force threatened is the equivalent of force exercised. There may be unlawful intimidation without any direct threats or overt acts of violence. Words or acts which are calculated and intended to cause an ordinary person to fear an injury to his person, business, or property are equivalent to threats. The number of pickets, their methods, their placards, and their circulars may constitute intimidation. A display of force without actual use thereof may be intimidation. 48 *Am. Jur.2d, Labor and Labor Relations*, § 1390.

In the context of discussing the provisions of § 502, the Supreme Court stated in *Gateway Coal* that there must be some objective evidence of an abnormally dangerous condition for work. 414 U.S. 368, 386, 94 S.Ct. 629, 38 L.Ed.2d 583. This Court is satisfied that the evidence of the threats and confrontations meets that standard. The Court does not believe that it was incumbent upon the craft employees to further prove the dangerous conditions by going forward in the face of the threats of violence, in order to establish the validity of such threats.

In the Court's opinion, the record is insufficient to support the conclusion that the Printers and Stereotypers have allied themselves with the Guild as a matter of principle. The evidence of their consistent avowed intent to work if possible cannot be disregarded in determining whether the unions are engaged in a concerted unlawful work stoppage.

As the Court cannot find that the Printers and Stereotypers are engaged in an unlawful work stoppage in violation of their contractual obligations, it necessarily follows that they could not be subjected to a mandatory order to discontinue such conduct.

However, as to the Pressmen and Mailers, there is no evidence that any of their members have attempted to report for work. There is likewise no evidence of the official position of the unions as regards the Guild strike. Consequently, it is just as reasonable to assume that the failure of those unions to report for work is by virtue of sympathizing with the Guild, as it is out of fear of the Guild. Absent any objective evidence that justifies the failure of those unions to report for work, this Court must conclude that they may be considered as strikers.

Having determined that the Pressmen and Mailers could be found to be engaged in an unlawful work stoppage, it must then be determined whether such a stoppage is subject to being enjoined under the *Boys Markets* standards, for as is pointed out therein, not every strike is subject to being enjoined. That issue is controlled by the terms of the parties' collective bargaining agreements.

Consistent with the Court's decision to treat on all issues inherent in this case, the Court will also consider the matter of whether the Printers and Stereotypers contracts will support a *Boys Markets* injunction, notwithstanding the conclusion reached as to those unions' status as non-strikers.

The Court has examined the collective bargaining agreements of all defendant

Unions. None of the said agreements contains an express no-strike clause comparable to those contained in the collective bargaining agreements in the cases previously considered herein in which mandatory orders were issued requiring the crossing of picket lines. Consequently, the obligation of these unions not to engage in work stoppages must be implied from the grievance-arbitration clauses of their contracts, and cannot exceed the scope of those clauses.

As to all the unions, plaintiff contends that "manning" provisions in each contract provide the basis for the finding of an arbitrable dispute, in that the work stoppages violate the unions' obligations thereunder. This Court does not agree with that position. The actual dispute here is the right of the craft employees to refuse to cross the Guild's picket line. To characterize the arbitrable dispute in terms of the manning provisions would bootstrap all work stoppages into arbitrable grievances. There can be many reasons for a work stoppage, and it is the validity of these reasons which is the proper subject for arbitration if the contract so provides, not the failure to work itself.

The Court finds that the Printers and Mailers contracts have reasonably broad grievance and arbitration clauses, although there are perhaps some ambiguities within the terms of the clauses. Those contracts also contain clauses pertaining to the subject of "Picket Line". Bearing in mind that in *Gateway Coal,* a *Boys Markets* injunction action, the Supreme Court did reaffirm the federal policy favoring resolving doubts as to arbitrability in favor of arbitration, if this Court were to apply the *Monongahela Power, NAPA, Pilot Freight* standards the Court would conclude that an arbitrable grievance supportive of a § 301 injunction exists. However, by virtue of the absence of strong express no-strike clauses, the contracts would certainly be borderline situations.

As to the Stereotypers contract, while the grievance-arbitration clause is arguably broad, the Court finds no other contract provisions therein comparable to those which afforded the basis for the orders in the *Monongahela Power* line of decisions. Therefore, the failure to cross a picket line could present no arbitrable dispute under the contract, and hence no § 301 injunction could issue.

In the Court's opinion, the grievance-arbitration provisions of the Pressmen's contract is of such a limited scope that it cannot be said to imply a no-strike obligation applicable to the facts of this case.

■ Finally, if this Court was of the opinion that the controlling law permitted the entry of an injunctive order, the Court, as dictated by both the Sixth Circuit Court of Appeals in the *North Avondale* decision and by the Supreme Court in *Boys Markets,* would have to take into account the general equitable considerations and the public interest as pertinent hereto. Injunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case. 42 *Am.Jur.2d, Injunction,* § 2.

Mr. Justice Black recognized that honoring a picket line has been a respected tradition within the labor movement:

Section 7 of the Taft-Hartley Act [29 U.S.C. § 157] recognizes a right of employees to work together in "concerted activities" for their mutual aid and protection. One way some union men help others is to refrain from crossing picket lines. Habitual respect for union picket lines has long been the practice of union men. This practice has been a prized asset of the unions. The Taft-Hartley Act was designed to regulate and restrict the type of concerted activities in which employees could engage. But even that Act did not attempt to deprive unions of the advantage of a policy that required union men to respect picket lines. *National Labor Relations Board v. Rocka-*

*way News Supply Co.,* 345 U.S. 71, 81, 73 S.Ct. 519, 525, 97 L.Ed. 832 (1953). The Court can understand the emotional impact that attempts to cross a picket line might have in a community with a long history of strong unionism.

Throughout these proceedings defendants have emphasized the risk of violence on the picket lines. Although the Court has some reservations about the evidence of certain of the altercations and confrontations between the defendant unions and the pickets, the Court does believe that an attempt to forcibly cross the picket line does present a real potential for violence.

In cases involving vindication of fundamental constitutional rights, the courts have granted injunctions even though aware that their decisions might result in violence and personal injury. However, this Court believes that in cases seeking vindication of contractual rights, the courts should draw a careful balance between the need to protect a litigant's private interests and the potential for public disorder that such action might entail.

As the authority of the courts to order any picket line breached is of recent origin, this Court has little historical perspective to draw upon in determining whether an injunctive order would result in actual violence. However, the Court cannot ignore the fact that violence did occur at the Plain Dealer in 1971, when members of craft unions attempted to forcibly cross a Guild picket line established in an economic strike.

As the Court has stated that its conclusions on all issues will be expressed, it is this Court's opinion that the equitable considerations would be sufficient to preclude the entry of a mandatory injunction herein, had it been necessary to reach that issue.

Plaintiff's motion for preliminary injunction will be denied.

/s/ BEN C. GREEN
*United States District Judge*

### ORDER

(Filed November 8, 1974)

UPON CONSIDERATION of plaintiff's motion for preliminary injunction,

IT IS HEREBY ORDERED that the said motion is denied; see this Court's memorandum of even date. The Court's ruling is certified pursuant to 28 U.S.C. § 1292(b).

/s/ BEN C. GREEN
*United States District Judge*