**12th AND L LIMITED PARTNERSHIP**

**v.**

**LOCAL 99–99A, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO.**

**JACK I. BENDER AND SONS**

**v.**

**LOCAL 99–99A, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO.**

**NORTHWESTERN DEVELOPMENT COMPANY**

**v.**

**LOCAL 99–99A, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO.**

**Civ. A. Nos. 74–1174 to 74–1176.**

United States District Court,
District of Columbia.

Jan. 31, 1975.

Joel I. Keiler, Washington, D. C., for plaintiffs in 3 cases.

Isaac N. Groner, Charles R. Both, Washington, D. C., for defendant in 3 cases.

## MEMORANDUM OPINION AND ORDER

GESELL, District Judge.

The above-captioned cases were consolidated and came before the Court for trial without a jury. The Court's jurisdiction is invoked under section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185.

Plaintiffs own a number of office buildings located mainly in downtown Washington, D. C. They are each affiliated by stock ownership or partnership interest with Blake Construction, a corporation, which manages the office buildings. Each plaintiff has entered into a separate but identical collective bargaining agreement with defendant Local 99. Sometime in the afternoon of Friday, July 26, 1974, Local 82 of the Service Employees International Union set up picket lines around the buildings of the plaintiffs. Thereafter during the week from July 27 to August 3, various members of defendant Engineers Local 99 failed to report to work at some of the picketed buildings, causing damages alleged to total $7,240.81 at four different buildings owned by one of the plaintiffs.

Plaintiffs contend that Local 99 violated its collective bargaining contract and engaged in an illegal strike or work stoppage. Local 99 claims it did not authorize or support the decision of some of its members not to cross the picket lines and that, in any event, the Local had not bargained away its right to strike or sponsor a work stoppage under the precise situation here presented.

It appears that Local 82 set up its pickets without any advance notice to the Engineers Union and this event caught Local 99 of the Engineers Union by surprise. When some individual members called the Union's office and inquired as to what should be done, no immediate advice could be given and after a series of informal communications a group of some ten to fifteen engineers met at the Union hall around 4:00 p. m. on Friday, July 26. The meeting was set up by telephone calls from the Shop Steward. At the Union hall the business manager of Local 99, Reed, and the Union's organizer, Surnack, were present. Sitting around a table with these officials, the members present asked a number of questions. They wished to know if they would be fined by the Union if they crossed the picket line and were told "no." They wished to know whether building management could take any reprisals against them and they were told "no." There was a general discussion as to what the men should do, what would be the repercussions if they went to work and what the repercussions would be if they crossed the picket line. The Union representatives advised the men that the Union was taking no official position in the matter. Some of the men present expressed the view they should stand as a union and act as a union, even though the business manager present would take no position one way or the other. The business manager did state his personal belief that while it was up to each member, no good union member would cross a picket line. Local 99 had approximately 20–30 representatives covered by the form of agreement here involved and at least half the membership of the Local was present at the meeting.

After a back and forth discussion lasting about an hour, a show of hands was sought and all present voted not to cross the picket line. Thereafter some members of the Union, including some individuals present at the meeting, did in fact cross the picket lines and the ac-

tions of the individual members were not uniform. The particular plaintiffs in these actions are owners of buildings that were affected by failure of individual members of the Union to report to work, but there were other buildings owned by the same interests and covered by the same labor agreements which were not affected in any way, even though picket lines existed at these buildings as well.

The Union argues that all that occurred was a "bull session," that the coming together of the Union members was not initiated by the Union, that no formal meeting was held, that no specific directions were given by the Union, that no penalties were threatened for those who might choose to cross the line, and that the resulting action was not uniform. It argues that on the basis of these facts the Court must find on the preponderance of the evidence that no Union action occurred and that the individual members who did not cross the lines simply acted in accord with their individual consciences.

■■ A close question is presented as to whether the facts outlined above are sufficient to place responsibility on the Union for any damages that subsequently resulted from failure of men to cross the picket lines. It has been recognized in the decisions that the facts must be examined in the light of each situation and that there is no litmus test which can be applied. Formal Union action is not necessary. Each case stands on its particular facts to be examined in the light of the underlying labor agreement. Clearly the Union did nothing here to dissuade its representatives and in effect nudged the men in a direction of not crossing the lines. Clearly, also, however, no directions were given to Union members which prevented them from taking individual action. The record does not disclose how many members of the Union reported after crossing lines and how many did not. It is reasonable to assume, as the Union's counsel sug-

gested at argument, that the men conferred informally after the meeting and reached decisions, building-by-building, rather than as an overall Union matter. Whether the Union is to be held responsible depends upon the contract. If the Union had agreed that its members would not strike or engage in work stoppage by refusing to cross another union's picket lines, it had a duty to act affirmatively to prevent its men from honoring the picket lines. This it did not do. No fines were imposed. No pressure was brought to force the men to go to work.

Where a union has entered into a contractual provision not to strike, it may be liable in damages under § 301 of the Act, 29 U.S.C. § 185, for breach of its duty to "use its best efforts to return striking workers to their jobs." *Wagner Elect. Corp.* v. *Electrical Workers Local 1104*, 496 F.2d 954, 956 (8th Cir. 1974); *Vulcan Materials Co.* v. *United Steelworkers*, 430 F.2d 446, 457 (5th Cir. 1970), *cert. denied*, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971); *International Union, United Mine Workers* v. *United States*, 85 U.S. App.D.C. 149, 177 F.2d 29, 36, *cert. denied*, 338 U.S. 871, 70 S.Ct. 140, 94 L. Ed. 535 (1949). In the light of the actions of the Union's agent, Reed, in encouraging the men not to cross the picket line, the Union will be liable, *see* 29 U.S.C. § 185(e), if it in fact bargained away its members' rights to refuse to cross the picket lines of another union.

Section 7 of the Act, 28 U.S.C. § 157, protects the rights of employees "to engage in . . . concerted activities for the purpose of . . . mutual aid or protection" and this has been construed to include a protected § 7 right to refuse to cross the picket line of another union. *See, e. g., Truck Drivers Local 413* v. *N L R B,* 118 U.S.App.D.C. 149, 334 F.2d 539, 545 (1964), *cert. denied,* 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); *N L R B* v. *Alamo Express, Inc.,* 430 F.2d 1032 (5th Cir. 1970), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 584, 27 L.Ed.2d 633 (1971). However, in *N L R B* v. *Rockaway News Supply Co.,* 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953), the Supreme Court held that a union could waive this right by agreeing to an appropriately worded no-strike clause.[1]

The no-strike clause involved in this case, which is set out in full below,[2] is appreciably narrower than that in *Rockaway, supra,* which, as already noted, provided broadly that the union would not sanction any "cessation of work" whatsoever during the term of the agreement. That is not the case here. Local 99 has only agreed not to strike over any "dispute" with the employer "arising out of the interpretation of or application of" their agreement.

In a Memorandum and Order filed November 8, 1974, the Court denied defendant's motion to dismiss on the grounds that the no-strike clause had not been "triggered" since there had been no written request for arbitration and therefore no arbitration decision was "pending." Although the Court stated, somewhat loosely, in that opinion

---

1. The terms of the no-strike clause in *Rockaway* provided:
 "No strikes, lockouts or other cessation of work or interference therewith shall be ordered or sanctioned by any party hereto during the term hereof . . . ." 95 N.L.R.B. 336 n. 1 (1951). The holding in *Rockaway* was confined to "a very narrow scope," 345 U.S. at 75, 73 S.Ct. 519, regarding the effect of this particular contract clause. *See* N L R B v. Southern Greyhound Lines, 426 F.2d 1299, 1302 (5th Cir. 1970).

2. *Article VII—Arbitration*
 Section 1. Any dispute arising out of the interpretation of or application of this Agreement that is not composed by the Union and the Employer within a reasonable time shall, at the written request of either party, be submitted to arbitration.
 . . .
 Section 7. There shall be no lockout by the Employer and no strike or stoppage of work called by or approved by the Union nor any other action taken by either party pending the arbitration decision and prompt compliance therewith.

that "the contract does not permit the Union to strike under the circumstances alleged in the amended complaint" (p. 4), the Court did not intend to hold as a factual matter that a "dispute" over the "interpretation or application" of the contract had been demonstrated. The Court reached only the legal arguments before it on the motion to dismiss.

Counsel for defendant now claims the evidence showed no "dispute" within the meaning of the contract between union and employer. This claim was made at final argument after all the testimony had been heard. Plaintiffs had relied on the Court's earlier ruling. In order to avoid prejudice, both sides were then given the opportunity to file post-trial briefs on the issue whether or not refusal to cross another union's picket line constitutes a "dispute" sufficient to invoke the no-strike obligation.

When this issue has arisen in the context of injunctive relief, the Circuits have divided sharply over whether a refusal to cross another union's picket line constitutes an arbitrable dispute with the primary employer sufficient to invoke a no-strike clause. *Compare Amstar Corp.* v. *Amalgamated Meat Cutters*, 468 F.2d 1372 (5th Cir. 1972), *with Monongahela Power Co.* v. *Electrical Workers Local 2332*, 484 F.2d 1209 (4th Cir. 1973); *Inland Steel Co.* v. *Local Union No. 1545, United Mine Workers*, 505 F.2d 293 (7th Cir. 1974); *NAPA Pittsburgh, Inc.* v. *Automotive Chauffeurs, Teamster Local 926*, 502 F.2d 321 (3rd Cir. 1974) (en banc), *cert. denied,* 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974). Both lines of cases rely in part on policies peculiar to the area of injunctive relief, no Court of Appeals has ruled on the issue in the context of suits for damages under § 301, and the Fourth Circuit has indicated that it would not necessarily follow its own holding in *Monongahela Power, supra,* in a damage action. *See Armco Steel Corp.* v. *United Mine Workers*, 505 F.2d 1129, 1134 n. 4 (4th Cir. 1974).

 Recognizing the issue to be unsettled in this Circuit, the Court has determined to follow *Amstar, supra,* in this case. The Court holds that the decision not to cross Local 82's picket lines involved no "dispute" with the employers and was therefore a protected right not bargained away under the contract. The rule that all doubts must be resolved in favor of arbitrability enunciated by the Supreme Court in the Steelworkers Trilogy, *see, e. g., United Steelworkers* v. *Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), and recently reaffirmed in *Gateway Coal Co.* v. *United Mine Workers,* 414 U.S. 368, 377–80, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), does not apply. Where the scope of the arbitration clause is susceptible to honest differences of interpretation, the possibility of injunctive relief is sufficient to serve the federal policy in favor of amicable resolution of labor disputes. Where damages are claimed, the contract terms must be more strictly interpreted. *Cf. Kellogg Co.* v. *N L R B,* 457 F.2d 519 (6th Cir. 1972), *cert. denied,* 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed. 2d 92 (1972).

Viewing the naked contract language, unsupplemented by any evidence as to the intent or practice of the parties, the Court holds there has been no agreement to waive the otherwise protected § 7 right of the members to refuse to cross a picket line under *Rockaway News, supra.* Since there was no dispute with the primary employer which could have been resolved through the arbitration process, the Court finds the parties did not intend the agreement not to strike "pending arbitration" to apply in this situation. *See Gary-Hobart Water Corp.,* 210 N.L.R.B. No. 87, 86 L.R.R.M. 1210, 74 CCH Lab.Cas. ¶ 26,516 (1974).

Although the Court has concluded that plaintiff has failed to prove a breach of the contract, it must recognize that this determination rests on issues of law unsettled in this Circuit. In the interests

of judicial economy, it is therefore appropriate to set forth conclusions with regard to the damages since there was a full trial on the merits.

Three categories of damages are claimed to be foreseeable consequences of the failure of Local 99 to cross the picket lines: at 1111–18th Street, damage to a compressor; at 1800–G Street, loss of compensation for overtime air-conditioning service and cost of labor recruited from Blake supervisory personnel to perform the functions of engineers not reporting to work at three buildings.

The compressor broke down. It is undisputed that an expense of $3,530.92 was incurred by Bender in Civil Action No. 74–1175, which includes some tools specially purchased having a continuing utility. The proof to support its claim was insufficient. The proof showed that the compressor failed shortly after it was started up when the oil pressure fell below minimum. Plaintiff suggests that a union operator on duty could have prevented this occurrence. However, it is not apparent from the proof what caused the oil pressure to drop. Deterioration of the bearings may have occurred and, if so, it would have been impossible to correct this condition for any length of time. Moreover, there is no explanation of why the machine failed to cut off automatically as designed before the pressure dropped below minimum levels. Thus the cause of the failure of the compressor could have been its age and deterioration or inattention of an operator. Plaintiff failed to carry its burden. Indeed, its failure to call the representative of the management who started up the machine on the day it

failed and the absence of more concrete proof as to the cause or causes of the failure serve to emphasize the insufficiency of the proof which, at best, is in equipoise. The Court rejects testimony of a member of the Union that he warned management about the inadequacy of the oil pressure.

The loss of overtime compensation for which $1,527 is claimed by Northwestern Development Company in Civil Action No. 74–1176 is based on the inability of the building to provide overtime air-conditioning. Its claim is premised on gross compensation which could have been earned under an undisputed contract with the tenant. No allowance is made for expense necessary to provide the service which proof shows would have been provided were it not for the strike. The claim must be reduced by $400 as a reasonable sum for the estimated expense, but the loss was shown to be proximately caused by the failure of Local 99 to report.

Finally, there is a claim for labor in the amount of $2,182 to be divided among plaintiffs, as itemized in exhibit 5.[3] This sum covers services rendered by Blake's personnel and made necessary by refusal of engineers assigned to the buildings involved to report to work. The labor was furnished, the expense was proximately caused by the failure of Local 99 to report, and the amounts were billed in accordance with standing procedures.

In accordance with the foregoing, which constitutes the Court's findings of fact and conclusions of law, judgment shall be entered in favor of the defendant in all three cases.

So ordered.

3. $1,587 to Jack I. Bender & Sons in C.A. 74–1175; $327 to Northwestern Development Co. in C.A. 74–1176; B $268 to 12th and L Limited Partnership in C.A. 74–1174.