**LATROBE STEEL COMPANY,**
Plaintiff,

v.

**UNITED STEELWORKERS OF AMERICA, AFL–CIO, et al.,**
Defendants.

Civ. A. No. 75–1120.

United States District Court,
W. D. Pennsylvania.

Dec. 9, 1975.

Henry J. Wallace, Jr., Joseph G. Armstrong, III, Pittsburgh, Pa., for plaintiff.

Frank J. Lucchino, Pittsburgh, Pa., for defendant.

OPINION

SCALERA, District Judge.

Steelworkers' Local 1537 represents the production and maintenance employees at plaintiff company's Latrobe plant. The members of Local 1537 refused to cross a picket line established at the plant by fellow employees who are members of another Steelworkers' local representing the plant's office and technical workers.[1]

The company claims that the union's refusal to cross the picket line of a sister union constitutes a violation of both the express no-strike clause and the grievance-arbitration provisions of the collective bargaining agreement.[2] The union argues that its refusal to cross the picket line is not an arbitrable dispute under the agreement and, therefore, that the arbitration and express no-strike provisions do not apply to this work stoppage.[3]

---

1. The picketing was part of the office and technical workers' effort to obtain their first collective bargaining agreement with the company.

2. The company cites *Island Creek Coal Co. v. United Mine Workers*, 507 F.2d 650 (3d Cir.), cert. denied, 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975), and *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs*, 502 F.2d 321 (3d Cir.), cert. denied, 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974), as support for this proposition.

The relevant provisions of the collective agreement are found at note 19, *infra*.

3. The union cites *Buffalo Forge Co. v. Steelworkers*, 517 F.2d 1207 (2d Cir. 1975), cert. granted, 423 U.S. 911, 96 S.Ct. 214, 46 L.Ed.2d 139 (1975); *Plain Dealer Publishing Co. v. Local 53*, 520 F.2d 1220 (6th Cir. 1975); *Gary Hobart Water Corp. v. NLRB*, 511 F.2d 284 (7th Cir.), cert. denied, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975); and *Hyster Co. v. Employees Assoc. of Kewanee*, 519 F.2d 89 (7th Cir. 1975), to support its position on this point.

The court granted injunctive relief under section 301 of the Labor-Management Relations Act of 1947,[4] in accordance with the *Boys Markets*[5] exception to the anti-injunction provisions of the Norris-LaGuardia Act.[6] Defendants filed a motion to vacate the entry of the preliminary injunction.

I

The company filed its complaint on Friday, September 5, 1975, seeking a temporary restraining order and, after a hearing, a preliminary injunction to compel the production and maintenance workers' return to work. The named defendants were the international union and its president, the district union and its director and staff representative, and the local union, its president and the chairman of the grievance committee, all individually and as trustees ad litem.

The court held a status conference in chambers on the morning of September 5. Counsel retained by the international and district unions was present. He indicated he did not represent the local. Counsel for the company indicated that he thought the international's counsel represented all defendants. The international's counsel stated that to his knowledge the local had not been notified of the proceedings, and asserted that he was not prepared to defend the local.

The court refused to grant a temporary restraining order because the company had not complied with Fed.R.Civ.P. 65(b), which requires counsel's written certification of the attempts to notify the adverse party.

The court scheduled a hearing for 2:00 p. m. on the afternoon of September 5. That afternoon counsel for the company filed the affidavit of the company's director of industrial relations, setting forth the successful efforts taken that day to notify the local of the proceedings.

The court resumed the conference in chambers. At that time, staff counsel from the international union was present and entered an appearance for the international and the local.

Following the status conference, the court proceeded to the scheduled hearing. At the outset of the hearing, counsel for the company indicated that he was modifying the terms of his proposed temporary order to delete the international and district unions as defendants. Thus, the hearing solely concerned the propriety of the local unions' refusal to cross the picket line.

II

At the hearing, the company produced evidence that the collective bargaining agreement in question contained an express no-strike clause and mandatory arbitration provisions, and that it was willing to arbitrate the dispute. The company introduced evidence to the effect that production had been shut down since the Thursday, September 4, midnight shift because the production and maintenance workers would not cross the picket line, that it already had suffered a loss of approximately "two-thirds of $10,000," and that it would lose approximately

---

4. June 23, 1947, c. 120, Title III, § 301, 61 Stat. 156; 29 U.S.C. § 185:

   (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

5. *Boys Markets v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

6. March 23, 1932, c. 90, § 4, 47 Stat. 70; 29 U.S.C. § 104:

   No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person . . . from doing . . . any of the following acts:

   (a) Ceasing or refusing to perform any work or to remain in any relation of employment . . . . .

$10,000 per day, would lose customers, and would incur increased expenses because it would be unable to stockpile to the extent it had planned before an increase in natural gas prices. The court is satisfied from the evidence that a production schedule was in effect which required production and maintenance workers to report to work over the weekend.

The local produced evidence and presented in defense several propositions which may fairly be summarized as follows: (1) that the union officials in good faith were making every attempt to get the workers to return to work; (2) that no injunction should issue unless it appeared that the action sought to be enjoined was of a "continuing" nature; (3) that the strike had not been in effect even for twenty-four hours; (4) that the company lacked "clean hands" because it had sought injunctive relief immediately; (5) that "equitable considerations" required the denial of an injunction; and (6) that the amount of harm the company alleged it would suffer as a result of the strike was doubtful.

Counsel for the local agreed that the company is in interstate commerce, that a strike was in process, and that a binding no-strike contract was in effect between the union and the company.[7] Counsel for the local also agreed that the members were obligated under the collective agreement to return to work.[8]

The only relevant defense asserted at the hearing with any possible persuasive effect concerned the uncertainty of the irreparable injury to the company. None of the defenses questioned the jurisdictional propriety of injunctive relief under the circumstances, nor was there any assertion that the union legally could refuse to cross the picket line.

The court concluded after the full hearing that the employee-members of Local 1537 were engaging in an illegal work stoppage, that the subject matter of the work stoppage was subject to the collective bargaining agreement's grievance and arbitration procedures, and that the subject matter of the work stoppage did not involve a genuine threat to the employees' health or safety. The court also determined that plaintiff would suffer irreparable harm were the strike allowed to continue, and that greater harm would result to plaintiff were injunctive relief to be denied than would result to defendant were it to be granted. The court therefore entered a preliminary injunction enjoining the local union, its officers, members and agents of all others acting in concert from engaging in a work stoppage.[9] The preliminary injunction further required the union, its officers, etc., and the company to utilize the grievance and arbitration procedures, and to take all action necessary to comply with the collective agreement. The injunction specifically required the employee-members to report for work and to cross any picket lines established at the plant. The court also approved plaintiff's bond in the amount of $1,000, an amount to which counsel for defendant had agreed.

## III

On Thursday, September 11, the union filed a motion to vacate the entry of the preliminary injunction.[10] It asserted that the anti-injunction provisions of the

7. Transcript of September 5 hearing, pp. 21–23.

8. Id., p. 7.

9. The court entered a preliminary injunction as opposed to a temporary restraining order because of the full hearing on the merits. Counsel for the local indicated at the hearing that the union had no other evidence to present and that no other defenses would be offered.

10. On September 10, the company filed an amendment to its complaint adding the chairman of the local's incentive committee and the committeeman for continuous and old mills, as defendants individually and as trustees ad litem.

On that date the company also filed a motion for adjudication of civil contempt against the union. The court scheduled a hearing on the contempt matter for September 11. At that time, the court found the defendants to be in civil contempt of the preliminary injunction. The court levied a fine and imposed further financial penalties payable to the United

Norris-LaGuardia Act [11] prohibit injunctive relief in this situation and cited *Plain Dealer, supra,* and *Buffalo Forge, supra,* in support. The motion contained no other defense and no factual averments. The defenses asserted at the September 5 hearing apparently were dropped at this point.

The parties indicated that they wished to submit memoranda. The court ordered that briefs be filed. The union filed a brief on September 16. The company responded on September 23. The union submitted an additional brief supporting the motion to vacate on September 24.

### IV

█ In *Boys Markets v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court held that section 301(a) of the Labor-Management Relations Act, which extends the jurisdiction of district courts to suits between employers and unions concerning contract violations, authorizes injunctive relief despite the Norris-LaGuardia anti-injunction provision where a union violates a no-strike provision of the collective bargaining agreement.[12] Prominent in the court's rationale was the notion that:

> [A] no-strike obligation, express or implied, is the *quid pro quo* for an under-

taking by the employer to submit grievance disputes to the process of arbitration. . . . Any incentive for employers to enter into such an arrangement is necessarily dissipated if the principal and most expeditious method by which the no-strike obligation can be enforced is eliminated. *Boys Markets v. Retail Clerks Union,* 398 U.S. at 248, 90 S.Ct. at 1591.

In *Gateway Coal Co. v. Mine Workers,* 414 U.S. 368, 381, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), the Supreme Court reiterated that *Boys Markets* "concluded that § 301(a) empowers a federal court to enjoin violations of a contractual duty not to strike."

### V

█ The Court of Appeals for the Third Circuit has considered the application of *Boys Markets* injunctive relief to work stoppages resulting from a union's refusal to dishonor the picket line of another union.

In *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs,* 502 F.2d 321 (3d Cir. en banc), cert. denied, 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974), the members of one union honored a picket line established at their plant by members of a union which sought to represent the corporation's employees at an-

States for each day that the injunction continued to be disobeyed.

On September 18, the company filed an application for a writ to sequester the union's funds because the injunction still had not been obeyed. The company informally requested that the court delay action on the motion, pending the workers' possible return to work. The workers returned on the afternoon of September 18.

On September 24, the union filed a motion to stay execution of the civil contempt judgment together with a supporting brief. A status conference was held on October 2. By an order entered October 3, the court stayed the execution of the civil contempt judgment and the writ of sequestration pending its disposition of the union's motion to vacate the preliminary injunction and any appeal therefrom.

11. See note 6, *supra.*

12. The court thus "accommodated" the Norris-LaGuardia anti-injunction provision, note 4,

*supra,* with the congressional preference for the arbitration of labor disputes that is embodied in the subsequently enacted Labor-Management Relations Act.

Section 203(d) of the Labor-Management Relations Act, 29 U.S.C. § 173(d), states in part:

> Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.

The Steelworkers' Trilogy, *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), announced the now well-known presumption of arbitrability for labor disputes.

other plant.[13] The collective bargaining agreement between the first union and the employer contained an express no-strike clause and provided that the union members could honor a "primary" picket line at the employer's place(s) of business. The parties also had agreed to arbitrate " '. . . any and all grievances, complaints or disputes arising between the employer and the union . . . .' "

The Third Circuit, after a rehearing en banc, held that the disagreement as to whether the picket line was "primary" and therefore allowed the union to honor the picketing without violating the agreement, was clearly a dispute between the union and the employer, and hence was arbitrable under the terms of the arbitration clause. The court understood Boys Markets to hold that

. . . where a matter has been made arbitrable by the terms of a contract between the union and the company, an injunction may be issued to enforce this method of settling controversies between the parties.

502 F.2d at 323. The court upheld the issuance of an injunction to compel the return of the workers pending arbitration.[14]

In Island Creek Coal Co. v. United Mine Workers, 507 F.2d 650 (3d Cir.), cert. denied, 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110, 44 U.S.L.W. 3192 (1975), the union honored a stranger picket line established by non-employees of the company. The settlement of disputes provi-

---

**13.** Judge Weis noted that the relationship between the two corporations was not identified clearly, and that such would assist in concluding whether the picket line was primary or secondary. 502 F.2d at 322, n. 2. However, it appears to this court that for purposes of determining whether or not the dispute is arbitrable in the first instance, the relationship between the corporations need not be established conclusively, because arbitrability of an issue is determined by examining the arbitration clause of the collective bargaining agreement.

**14.** The court cited Monongahela Power Co. v. Electrical Workers Local 2332, 484 F.2d 1209 (4th Cir. 1973), to support its conclusion. The agreement in Monongahela Power contained an express no-strike clause and an arbitration clause applicable to "(a)ny dispute between the Company or employees covered by this Agreement with respect to the interpretation, application, or claimed violation of any express provision of this Agreement . . . ." (emphasis added by the Fourth Circuit). The Third Circuit noted that the agreement did not contain any reference to honoring another union's picket line.

The Fourth Circuit in Monongahela Power characterized this language as "extremely broad and encompassing," and noted that the no-strike clause prohibited the employees from engaging in any work stoppage or impeding of work. The court concluded that the dispute as to whether the work stoppage violated the no-strike clause was a matter of construction of the no-strike clause and hence was clearly arbitrable. The court felt that this conclusion was particularly apt in view of the Supreme Court's direction that arbitration should be or-dered " 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)." 484 F.2d at 1213.

It appears that the allowance of injunctive relief in Monongahela Power was upon a broader ground than that in NAPA, because the NAPA agreement at least referred to the union's right to honor a primary picket line.

The court in NAPA also cited Pilot Freight Carriers v. Teamsters, 497 F.2d 311 (4th Cir. per curiam), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). That case held that the "relationship between the no-strike clause and the clause allowing individual employees to refuse crossing a primary picket line was . . . an arbitrable matter . . . ." 497 F.2d at 313. The court sustained the entry of an injunction against the striking union.

For other cases upholding injunctive relief and the arbitrability of a disagreement over the union's refusal to dishonor a picket line, see Wilmington Shipping Co. v. Longshoremen, 86 LRRM 2847 (4th Cir.), cert. denied, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974); Northwest Airlines, Inc. v. Airline Pilots Assoc. Inter., 442 F.2d 251 (8th Cir. 1971); Bethlehem Mines Corp. v. Mine Workers, 375 F.Supp. 980 (W.D.Pa.1974); Barnard College v. Transport Workers Union, 372 F.Supp. 211 (S.D.N.Y.1974); Pilot Freight Carriers, Inc. v. Teamsters, 86 LRRM 2419 (N.D.Ga., March 25, 1974); General Cable Corp. v. Electrical Workers Local 1798, 333 F.Supp. 331 (W.D.Tenn. 1971).

sions of the collective bargaining agreement were "virtually identical" [15] to the provisions construed by the Supreme Court in *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). Neither agreement contained a no-strike clause, but the grievance-arbitration provisions required the reference to arbitration of "differences . . . as to the meaning and application of the provisions of this agreement, . . . differences . . . about matters not specifically mentioned in the agreement, . . . (and) any local trouble of any kind aris(ing) at the mine."

The Supreme Court in *Gateway Coal* concluded that the language "any local trouble . . ." was sufficiently broad to encompass the dispute over the safety matters at issue in the case and, therefore, that the agreement required the arbitration of the dispute. The court noted that

An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. 414 U.S. at 377–378, 94 S.Ct. at 637 (quoting from *United Steelworkers of America v. Warrior & Gulf Navigation Co., supra*, 363 U.S. at 582–583, 80 S.Ct. 1347).

The Supreme Court held that the union's duty to arbitrate under the agreement gave rise to an implied no-strike obligation which would support the issuance of an injunction against the work stoppage. The court reasoned that, in the absence of an explicit negation of an implied no-strike obligation, the agreement to arbitrate and the duty not to strike should apply coterminously.

Given the analysis of *Gateway Coal*, the Third Circuit in *Island Creek* apparently determined that resolution of the problem before it required a single inquiry: whether the arbitration provisions encompassed the dispute.[16] The court characterized the clause as "unusually broad." It noted that the union members' right to honor lawful stranger picket lines could be bargained away,[17] and concluded that under the scope of the arbitration clause the union could have arbitrated the discharge of one of its members for refusing to cross a picket line. Upon this basis, the court determined that the "dispute over whether the union has contracted away its members' right to honor stranger picket lines is an arbitrable dispute . . .." [18]

Regardless of any differences between *NAPA* and *Island Creek*, the operative proposition suggested by both cases is that where arbitration provisions can be construed to encompass a dispute concerning the unions' right to honor a picket line, injunctive relief under section

**15.** The characterization is that of the Third Circuit, 507 F.2d at 651.

**16.** "If the underlying dispute falls within the scope of the grievance-arbitration clause, then, on the authority of *Gateway* the (issuance of the preliminary injunction) must be affirmed." 507 F.2d at 651. The court noted that the Seventh Circuit had considered the question under similar factual circumstances involving similar contractual provisions, and had concluded that injunctive relief was proper. *Inland Steel Co. v. Local No. 1545, United Mine Workers*, 505 F.2d 293 (7th Cir. 1974). Refer to the discussion in note 33, *infra*.

The Third Circuit distinguished *Gateway Coal* on the factual basis that "the underlying safety dispute involved was between the employer and its employees . . . .." 507 F.2d at 652.

**17.** *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953).

**18.** 507 F.2d at 653. See also *Amalgamated Meat Cutters and Butcher Workmen v. Cross Brothers*, 518 F.2d 1113, 1117 (3d Cir. 1975); cf. *Jones & Laughlin Steel Corp. v. Mine Workers*, 519 F.2d 1155, 1158 (3d Cir. 1975). However, the court admonished that under circumstances where neither an express no-strike clause nor a reference to the honoring of picket lines exists, a different result might obtain were the arbitration clause narrower. Judge Adams dissented to the court's decision in *Island Creek* on the basis of Judge Hunter's analysis in *NAPA*, and for the additional reason that *Island Creek* represented to him an extension of *NAPA*, which indicated that further extensions perhaps would be impossible to preclude.

301(a) is appropriate to compel use of the grievance-arbitration procedure.

Therefore, initially this court's inquiry concerns the proper construction of the grievance-arbitration provisions.

## VI

■ The collective bargaining agreement in the instant case [19] contains an express no-strike clause under the grievance and arbitration section of the contract, Section VIII B. In addition, the intent and purpose of the agreement is to provide the "sole procedure for prompt, equitable adjustment of alleged grievances to the end that there shall be no interruption . . . of the work, work stoppages (etc.) . . . ." Section 1A. The specific arbitration clause, Section VIII B, covers "differences aris(ing) between the Company and the Union *as to the meaning and application* of the provisions of this agreement . . . (and) *any local trouble of any kind aris(ing) in the plant.* . . ." (Emphasis added.)

Different portions of these provisions appear in the contracts construed in NAPA and in Island Creek.[20] Comparison of the contractual language, however, leads the court to conclude that the Latrobe agreement does not significantly differ from the agreements in *NAPA* and *Island Creek* so as to warrant a result contrary to the results in those cases.[21]

---

**19.** The relevant provisions of the agreement are as follows:

I. Intent and Purpose

A. It is the intent and purpose of the parties hereto to set forth herein the Basic Agreement *covering rates of pay, hours of work and the conditions of employment* to be observed between the parties hereto; and, *to provide the sole procedure for prompt, equitable adjustment of alleged grievances* to the end that *there shall be no interruption or impeding of the work, work stoppages, strikes, lockouts, or other interferences with production during the life of this Agreement.*

\* \* \* \* \* \*

VIII. Adjustment of Grievances

A. \* \* \*

B. Should differences arise between the Company and the Union as *to the meaning and application of the provisions of this Agreement* or should *any local trouble of any kind arise in the plant, there shall be no suspension of work on account of such differences,* but an *earnest effort shall be made to settle such differences* promptly in the manner hereinafter outlined. Any grievance in the process of adjustment on the date of the execution of this Agreement shall be handled in accordance with the procedure herein outlined.

\* \* \* \* \* \*

I. Suspension of Grievance Procedure

It is further understood that an interruption or impeding of the work, stoppage or strike on the part of the Union or a lockout on the part of the Company, shall be a violation of this Agreement, and *that under no circumstances shall the parties hereto discuss the grievance in question or any other grievances while the work interruption, impeding or suspension of the work is in effect.* It is further agreed that, if this procedure is not followed and as a result of such failure an interruption or impeding of the work, stoppage, or strike occurs, the offending person or persons refusing to resume normal work *may be suspended and later discharged* from the employment of the Company in accordance with Section X of this Agreement. . . . (Emphasis added.)

**20.** The instant agreement contains an express no-strike clause as did the contract involved in *NAPA*; this arbitration clause extends to the "meaning and application of the provisions," while the *NAPA* clause covered "any and all grievances, complaints and disputes between the union and the employer;" and this clause covers "any local trouble of any kind in the plant, while the *NAPA* contract contained a provision allowing the union's members to honor a primary picket line. The *Island Creek* agreement did not have an express no-strike clause; the arbitration clause extended to specifics covered in the contract as well as to "matters not specifically mentioned;" and the arbitration clause expressly covered "any local trouble of any kind at the mine."

**21.** *Island Creek's* suggestion that a narrower arbitration clause might dictate a different result under similar circumstances, that is, where neither an express no-strike clause nor a reference to honoring picket lines exists, 507 F.2d at 654, is inapposite. The grievance procedures of both the *Island Creek* contract and this contract specifically cover "any local trouble. . . ." The *Island Creek* agreement did not contain an express no-strike clause but this agreement does. The grievance procedures of the *Island Creek* agreement covered "matters not specifically mentioned" in the contract, while the procedures of this agreement cover "the meaning and application of the provisions. . . ."

The court holds that these provisions are sufficiently broad as to encompass a dispute over the unions' right to honor a picket line. This position is reinforced by the admonition in *Warrior & Gulf* and in *Gateway Coal* that arbitration should not be denied unless it can be stated positively that "the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." [22]

## VII

The union's arguments in its briefs in support of its position that a *Boys Markets* injunction is inappropriate may be summarized as follows: (1) the factual circumstances of this case are distinguishable from the situation to which *Boys Markets* is addressed; (2) the differences between the contractual language in this agreement and in the *Island Creek* agreement are significant and require a result different from the results in those cases; (3) the factual circumstances sufficiently distinguish this case from *Island Creek*; (4) other courts have construed the application of similar or identical provisions in comparable situations and have concluded that injunctive relief is inappropriate; and (5) the company is precluded from obtaining an injunction because it did not comply with its obligations under section 8 of the Norris-LaGuardia Act to "make every reasonable effort to settle [the] dispute." The court will consider these arguments more specifically.

### (1)

In distinguishing the *Boys Markets* situation from this case, the union asserts that the dispute between itself and the company is not "over a grievance" which both parties are bound to arbitrate under the mandatory arbitration provisions of the collective bargaining agreement. It concludes that the work stoppage did not violate the express no-strike clause so as to allow *Boys Markets* injunctive relief.

The union's argument relies upon the rationale expressed by Judge Hunter's dissent in *NAPA*.[23] Claiming that the majority read *Boys Markets* too expansively, Judge Hunter stressed that the *Boys Markets'* decision emerged from an accommodation of specific policy considerations and reflected the need to promote the arbitration of labor disputes. He noted that *Boys Markets* involved a dispute which the union, under the terms of its collective bargaining agreement, had agreed to arbitrate. Thus, the union's work stoppage in lieu of arbitration was an overt attempt to use an economic means to force the employer's capitulation on a grievance that should have been arbitrated. Injunctive relief in that situation was proper because, by striking, the union sought to avoid the arbitrator's jurisdiction to which it had originally consented. Because of both *Boys Markets'* factual circumstances and policy considerations, and the Supreme Court's admonition that the decision presented a narrow exception to Norris-LaGuardia anti-injunction provisions, Judge Hunter concluded that injunctive relief is permissible only when the underlying clause of the strike is an arbitrable dispute.[24]

Applying this understanding of *Boys Markets* to the *NAPA* situation, Judge Hunter stressed that injunctive relief

---

Thus, while this agreement might be narrower than that in *Island Creek* in regard to some provisions, other provisions are identical. This court cannot say that the differences that do exist are sufficient to dictate a different result.

**22.** 414 U.S. at 377–378, 94 S.Ct. at 637.

**23.** 502 F.2d at 324. Chief Judge Seitz joined in Judge Hunter's dissent. Judge Adams dissented in a separate opinion.

**24.** Judge Hunter cites *Parade Publications, Inc. v. Philadelphia Mailers*, 459 F.2d 369, 374 (3d Cir. 1972):

We read (*Boys Markets*) to indicate that arbitration should be encouraged by permitting judicial enforcement of a 'no-strike' clause when the underlying issue is arbitrable, but that there should be no injunction if the underlying dispute is not arbitrable. 502 F.2d at 330, n. 13 (emphasis added by Judge Hunter).

was improper because the *NAPA* work stoppage was not designed to force the employer to capitulate on an arbitrable issue. Instead, the work stoppage itself was the arbitrable dispute. Hence, the policy considerations that dictated injunctive relief in *Boys Markets* did not necessitate similar relief in *NAPA*.[25]

Judge Hunter's analysis in *NAPA* is a dissent, and indeed represents a minority position of the court en banc. The majority was persuaded by the opinion that the case involved a dispute which was arbitrable under the provisions of the collective agreement and, therefore, that injunctive relief was proper under *Boys Markets*. Furthermore, the dissent in *Island Creek*[26] clearly shows that Judge Hunter's *NAPA* analysis again was before the court.[27]

This court is constrained to follow the majority position of the Third Circuit as expressed in *NAPA* and *Island Creek*.

(2)

The union's argument stressing the substantiality of the difference in the language of the Latrobe and *Island Creek* arbitration clauses is supported by reference to two specific provisions.

First, the union points out that the *Island Creek* grievance procedure, in addition to covering disagreements as to matters specifically mentioned in the contract, also extends to disputes over "matters not specifically mentioned." This is contrasted with the grievance procedure in the Latrobe agreement which covers disputes as to the "meaning and application of the provisions."

While *Island Creek's* coverage of "matters not specifically mentioned" perhaps does render that provision broader in scope than the corresponding provision in the Latrobe agreement, the court must note that this argument considers only one of the contractual provisions involved in determining whether the union members' refusal to dishonor the picket line constitutes an arbitrable dispute under the arbitration clause. That this individual provision may be broader than the provision in the Latrobe agreement is not determinative without re-

---

**25.** "If the arbitrable dispute is not a 'cause' of the work stoppage, then a concession on that dispute by the employer will not help to end the work stoppage. Under these circumstances, the work stoppage will exert no pressure on the employer to resolve the arbitrable issue short of arbitration. Thus, if this basic cause-effect relationship between arbitrable issue and the strike is not present, the strike will not discourage arbitration and the policy that favors arbitration of labor disputes will not be furthered by the issuance of an injunction.

". . . Here, the dispute that was the sole underlying cause of the (first union's) work stoppage was the fight between the Company and (the second union) that led to the creation of that (the second) union's picket line. This issue was plainly not arbitrable under Company-(first union) collective bargaining agreement since it did not involve the first union). Thus, though it caused the strike it provided no reason for the issuance of a *Boys Markets* injunction.

". . . (T)he dispute as to the nature of the (second union's picket line and thus as to the legality of the (first union's) work stoppage was arbitrable. However, this dispute was never an 'underlying cause' of the (first union's) work stoppage since it arose after that work stoppage had begun and never became a basis for its continuation. As a result, the strike never deterred the arbitration of this

issue and the existence of this dispute never provided a basis for the issuance of an injunction under the holding in *Boys Markets*." 502 F.2d at 330–331.

See also *Amstar Corp. v. Amalgamated Meat Cutters and Butcher Workmen*, 468 F.2d 1372 (5th Cir. 1972); *12th & L Ltd. Part. v. Local 99–99A*, 396 F.Supp. 1174 (D.D.C.1975); *General Cable Corp. v. Electrical Workers Local 1644*, 331 F.Supp. 478 (D.Md.1971); *Simplex Wire and Cable Co. v. Electrical Workers Local 2208*, 314 F.Supp. 885 (D.N.H.1970); Note, 88 Harv.L.Rev. 463 (1974).

The union also asserts that injunctive relief in this case would contravene the "central purpose" of the Norris-LaGuardia Act, i. e., "to foster the growth and viability of labor organizations," in that the Local 1537 dispute "is part and parcel of the (office and technical workers') strike which a federal court cannot enjoin." The court's injunction against this local "directly reduces" the pressure brought upon the company by the other union to enter into an agreement and thus "reduces significantly the ability of the (other union's) employees to effectively exercise their lawful right to strike."

**26.** 507 F.2d at 654.

**27.** Refer also to *Amalgamated Meat Cutters & Butcher Workmen v. Cross Brothers*, 518 F.2d 1113 (3d Cir. 1975).

gard to the other provisions. The court has considered the provisions of the grievance procedures involved in *NAPA, Island Creek,* and this case in their totality. Defendants' reference to the breadth of one of the *Island Creek* provisions does not change the court's conclusion that the terms of the grievance procedure in the instant agreement, considered in their totality, are not sufficiently different from the *NAPA* and *Island Creek* provisions so as to justify a result contrary to the results in those cases.

Second, the union distinguishes *Island Creek* upon the following grounds: (1) that the arbitration clause in the Latrobe agreement applies to "any local trouble of any kind *in the plant,*" while the *Island Creek* clause extends to "any local trouble of any kind *at the mine*" (emphasis added); and (2) that the no-strike clause in the instant agreement "applies only under the adjustment of grievances section" of the collective agreement.[28]

It is alleged that the phrase "in the plant" specifically refers to matters concerning wages, hours, or terms and conditions of employment of the production and maintenance workers, whereas *Island Creek's* "at the mine" language literally encompasses anything occurring "at the mine." Further, it is alleged that the specific language "in the plant," considered in view of the fact that the no-strike clause "applies only under the adjustment of grievances section," establishes that there is no support for the notion that the union bargained away its members' right to honor the picket line of another union, and that the only mat-

ters over which the right to strike was bargained away were those matters "in the plant" concerning wages, hours, etc.

The union stresses that the issue before the court is unique because the no-strike clause applies only under the grievance provisions.[29] While the union distinguishes *NAPA* and *Island Creek* as to this point,[30] it does not indicate what effect the no-strike commitment in the "Intent and Purpose" section of the agreement[31] has on its argument that the no-strike obligation "applies only under the adjustment of grievances section."

The legal proposition sought to be advanced by the arguments concerning the distinction between "in the plant" and "at the mine" language and concerning the specific application of the no-strike clause in reality is that the dispute must be "over a grievance" before a *Boys Markets* injunction can issue. The union is asserting that the terms of the agreement, i. e., the "in the plant" language, specifically indicate that the arbitration provisions apply only to wages, hours, etc., therefore that an injunction cannot issue because the right to refuse to dishonor a picket line is not within the arbitration clause. As the court has already pointed out, this contention relies upon Judge Hunter's *NAPA* dissent for its efficacy.

In that these arguments present nothing that the court has not already considered, the court must abide by its determination that it is constrained to follow the position expressed by the Third Circuit in *NAPA* and *Island Creek.*

---

**28.** Quoted from defendant's first brief, p. 4.

**29.** The union considers the issue before the court to be "the propriety of issuing a *Boys Markets* injunction against the honoring of a sister union's picket line where the no strike obligation (is) . . . part and parcel of the arbitration clause . . . ." (Defendant's second brief, p. 11).

**30.** The union asserts that *NAPA* does not cover this issue because the contract there in-

volved contained a clause permitting the union's members to honor a primary picket line and "the Third Circuit held that because of the presence of that clause the question of whether or not the picket line was primary or secondary was for the arbitrator to decide." Nor does it think *Island Creek* covers the issue because of the particularly broad arbitration clause found in that contract.

**31.** Section IA of the Collective Bargaining Agreement, Note 19, *supra.*

### (3)

The factual distinction relied upon by the union in arguing the inapplicability of *Island Creek* is that the picket line in that case was established by workers who were not fellow employees of the union members who honored the line, while in this case a co-employee relationship exists.

The union does not explain the impact that it assumes this distinction has on the precedential value of *Island Creek* in this situation. The question in this case is whether the dispute concerning the union members' right to cross the picket line of a stranger/sister union is arbitrable under the terms of a particular collective agreement. The relationship between the employer and the members of the stranger/sister union that established the picket line would seem to have little bearing on the resolution of this issue. The court cannot find any meaningful distinction between this case and *Island Creek* on this ground.

### (4)

The union refers to several cases in which courts have considered the application of similar or identical arbitration provisions to analogous factual circumstances and have concluded that injunctive relief is inappropriate.

*Buffalo Forge Co. v. Steelworkers*, 517 F.2d 1207 (2d Cir. 1975), cert. granted, 423 U.S. 911, 96 S.Ct. 214, 46 L.Ed.2d 139 (1975), appears to deal with the precise situation facing this court. Production and maintenance employees ("the first union") honored the picket line established by office and technical workers seeking their first collective bargaining agreement with the employer. The arbitration provision of the agreement between the employer and the first union is identical to that involved in this case,[32] and the no-strike clause is similar, though not different in any significant respect. The Second Circuit affirmed the district court's denial of an injunction on the ground that the strike was not over any grievance between the first union and the company, but rather was simply a manifestation of the workers' deference to the picket line. As such, the strike did not seek to pressure the employer to capitulate on a dispute that was arbitrable under the provisions of the collective bargaining agreement and therefore did not attempt to circumvent the arbitration machinery established in the agreement. The court emphasized the narrowness of *Boys Markets* as it viewed the decision applying only to strikes "over a grievance" which the union has agreed to arbitrate. The court also cited Judge Hunter's *NAPA* analysis as to the effects of an injunction upon the policy favoring arbitration.

*Plain Dealer Publishing Co. v. Local 53*, 520 F.2d 1220 (6th Cir. 1975), also held injunctive relief improper in a similar situation. Although unions other than the Steelworkers were involved and the relevant contractual provisions were not set forth in the opinion, the court expressly indicated that it affirmed the denial of an injunction upon the basis of both the Second Circuit's *Buffalo Forge* opinion and the district court's *Plain Dealer* opinion. As far as could be determined by this court, the factual circumstances involved in *Plain Dealer* do not vary significantly from those in either *Buffalo Forge* or the instant case.

This court cannot adopt the reasoning of these cases in view of the Third Circuit's determination that injunctive relief under section 301(a) is appropriate where the arbitration provisions encompass the dispute over the union's right to honor a picket line. The court notes that *Buffalo Forge* and *Plain Dealer* by virtue of its citation of the Second Circuit's opinion, relies on an analysis of *Boys Markets* similar to that of Judge Hunter in *NAPA*. Again, this is a minority position in the Third Circuit. This court will follow the position indicated

---

32. The arbitration provision appears in the district court's opinion, 386 F.Supp. 405, 407 (W.D.N.Y.1974).

by the majority in *NAPA* and further elucidated in *Island Creek*.[33]

The union also argues that the Third Circuit itself emphasized the *Boys Markets* requirement that an arbitrable dispute must cause the strike before injunctive relief is proper in *Parade Publications, Inc. v. Philadelphia Mailers Union,* 459 F.2d 369 (3d Cir. 1972), and in *United States Steel Corp. v. Mine Workers,* 456 F.2d 483 (3d Cir. 1972).[34]

In citing these cases, the union is attempting to buttress Judge Hunter's *NAPA* position with precedents from within the circuit. Similarly, Judge Hunter in *NAPA* cited *Parade Publications* to support his position.[35]

In view of the determination of the majority en banc in *NAPA,* together with the *Island Creek* sequel, this court cannot rely on the statements in *Parade Publications* and *U. S. Steel v. Mine Workers* in order to reach a holding in accord with Judge Hunter's analysis.

(5)

█ The union's final argument is that the failure of the company to exercise the right to grieve afforded to it by the collective bargaining agreement [36] violated the condition that the company make "every reasonable effort to settle the dispute" before injunctive relief may

---

**33.** The union also cited *Gary Hobart Water Corp. v. NLRB,* 511 F.2d 284 (7th Cir.), cert. denied, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975), and *Hyster Co. v. Employees Association of Kewanee,* 519 F.2d 89 (7th Cir. 1975). These cases found that a union's refusal to dishonor a picket line did not constitute an arbitrable dispute under the respective collective bargaining agreements involved. The Seventh Circuit determined that both of these cases were distinguishable from *Inland Steel Co. v. Local No. 1545, United Mine Workers,* 505 F.2d 293 (7th Cir. 1974), wherein it decided that the "expansive" arbitration clause rendered such a refusal to cross a picket line an arbitrable dispute. The clause involved in *Inland Steel* is similar in all significant respects to the clauses considered in *Gateway Coal* and *Island Creek.* See text at note 15, *supra.* The clauses considered in *Gary Hobart* and *Hyster* were more restrictive, which the Seventh Circuit determined was crucial to its finding of the dispute's non-arbitrability. Furthermore, the analyses in those cases approximate Judge Hunter's *NAPA* analysis. For these reasons, this court cannot follow the Seventh Circuit's position as opposed to the Third Circuit's.

**34.** Defendant cites the following from *Parade Publications*:

Parade's argument that the strike itself clearly created an arbitrable issue of whether the union had violated the general "no strike" clause does not require a different result for two reasons. First, it is apparent from the court's reference to "any dispute which underlies the alleged walkout" that it did not rest its decision to issue an injunction upon a finding that the strike itself created an issue which the parties have bound

themselves to arbitrate. Second, this argument of Parade goes beyond anything decided in the *Boys Markets* case. Indeed, if the Diversified situation caused the strike and does not present an issue which the parties have bound themselves to arbitrate, it would run contrary to the rationale of *Boys Markets* to grant Parade an injunction. We read the opinion in that case to indicate that arbitration should be encouraged by permitting judicial enforcement of a "no strike" clause when the underlying issue is arbitrable, but that there should be no injunction if the underlying dispute is not arbitrable. 459 F.2d at 374 (3d Cir. 1972).

The relevant portion of the *Mine Workers'* case is as follows:

[*Boys Markets*] held only that the express prohibitions against certain specific injunctions contained in § 4 of Norris-LaGuardia . . . were deemed not to bar injunctions necessary to accomplish the purposes of the Labor-Management Relations Act through contract arbitration. The court . . . made clear that *it was dealing only with* the prohibitions of § 4 of Norris-LaGuardia, and then only in cases where the court first holds that a strike is *over a grievance* which both parties are contractually bound to arbitrate. (Emphasis added.) 456 F.2d at 487.

**35.** 502 F.2d at 330, n. 13.

**36.** VIII. H. "The Grievance procedure may be utilized by the Company in processing Company grievances. In processing such grievances, the Company shall observe the specified time limits in appealing and the Union shall observe the specified time limits in answering."

issue, as provided in section 8 of the Norris-LaGuardia Act.[37] While the court must agree with defendants' citation of the principle embodied in section 8 of the Norris-LaGuardia Act, the court cannot agree that under the circumstances of this case section 8 bars the company from obtaining injunctive relief.

The cases cited in support of this argument are distinguishable from the case under consideration.[38]

*Rutland Railway Corp. v. Locomotive Engineers,* 307 F.2d 21 (2d Cir. 1962), cert. denied, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963), appears to be one of the stronger supports of the union's argument. That case held that under the provisions of both the Railway Labor Act and section 8 of the Norris-LaGuar-

dia Act, an injunction could not be entered against a union's strike over a "minor" dispute concerning the railroad's right to change train schedules unilaterally, unless it appeared that the railroad had made a good-faith effort to settle the dispute by a "conference" required by the Railway Labor Act. Nonetheless, the case is distinguishable in that the "every reasonable effort" requirement of section 8 of Norris-LaGuardia was there reinforced and further defined by the Railway Labor Act's specific requirements and established procedures for the calling of conciliatory conferences to discuss minor disputes. The court in *Rutland* could not determine from the record whether the "discussions" conducted by the railroad sufficiently met the stan-

---

**37.** March 23, 1932, c. 90, § 8, 47 Stat. 72; 29 U.S.C. § 108:

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

This argument was advanced by the defendant in *Buffalo Forge,* but was not considered because of that court's determination that injunctive relief was improper. 517 F.2d at 1209, n. 4.

**38.** *ITT World Communications, Inc. v. Communications Workers,* 422 F.2d 77 (2d Cir. 1970), and *Drake Bakeries, Inc. v. Local 50, Bakery Workers,* 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962), both discuss the arbitrability of a union's alleged violation of a collective agreement's no-strike clause and indicate that policy considerations favoring arbitration indeed may require that an employer initiate the grievance and arbitration procedure, but neither case deals with section 8 of the Norris-LaGuardia Act.

*Emery Air Freight Corporation v. Local Union 295,* 449 F.2d 586 (2d Cir. 1971), contains the following language:

Section 8 of the [Norris-LaGuardia] Act, 29 U.S.C. § 108, requires a showing by the complainant that he has made "every reasonable effort to settle the dispute." 449 F.2d at 588.

The court simply states that this is one of the various conditions to the issuance of injunctive relief, and cites others as being sections 7 and 9 of the Act as well as the criteria outlined in

*Boys Markets,* 398 U.S. at 254, 90 S.Ct. 1583. There is no other discussion of section 8 nor any application of the section to the case before the court.

*Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western Railroad,* 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944), reversed the grant of injunctive relief on the ground that the employer did not comply with section 8 requirements. The factual circumstances distinguish that case from the one before this court. The union consented to arbitration at the insistence of the mediation board after both parties had refused to arbitrate under the provisions of the Railway Labor Act, however, the employer continued to refuse to arbitrate, seeking instead the appointment of an emergency board. The court concluded that section 8 is not satisfied by the employment of "only one conciliatory device when others are available." 321 U.S. at 57, 64 S.Ct. at 417. Further, it appears that the union went on strike only after the employer refused to arbitrate.

Contrary to the union's assertion that *United States Steel Corp. v. Mine Workers,* 456 F.2d 483 (3d Cir. 1972), "held that the sections of the Norris-LaGuardia Act other than Section 4 apply to *Boys Markets* injunctions so long as those sections do not conflict with the policy underlying section 301 of the Labor-Management Relations Act . . ." (defendant's second brief, p. 7), that case specifically considered only section 7 of Norris-LaGuardia, and only concluded that that section was applicable to such relief upon detailed analysis of section 7 and its underlying policy considerations. It is impossible to conclude that the discussion of this point can be construed to cover section 8 of the Act.

dards imposed by the Railway Labor Act for such conferences, and thus remanded the case for a determination of this point by the district court. This court thinks that the Railway Labor Act's specific provisions for conferences, by reference to which a court could meaningfully evaluate whether or not a "reasonable effort" under Norris-LaGuardia section 8 had been made to settle the dispute, distinguishes *Rutland* from the instant case.

In *Transamerican Trailer Transport, Inc. v. Seafarers International Union*, 336 F.Supp. 1052 (D.Puerto Rico, 1971), it was determined that an employer could not enjoin union members from refusing to cross the picket line of another union, where the employer had not properly invoked the arbitration procedure outlined in the collective bargaining agreement prior to seeking injunctive relief. The grievance and arbitration sections of the collective agreement contemplated the employer's resort to such procedures, and, interestingly, the sections specifically provided that no licensed engineer ". . . be required to either work behind a picket line or cross a picket line." 336 F.Supp. at 1055, n. 3. The court did not refer to section 8 of Norris-LaGuardia. Instead, the court found that the collective agreement required the submission of grievances in writing, which in turn effected specific limitations on the time within which the other party could respond, and that the employer had made only an oral request or offer to arbitrate. The court thought that one of the holdings *Boys Markets* requires of a court before injunctive relief can be entered is

(6) that the aggrieved party has invoked the grievance and/or arbitration procedure established in the collective bargaining agreement . . . . 336 F.Supp. at 1057.

It appears to this court that *Boys Markets* does not require this specific holding. *Boys Markets'* statement concerning those guidelines helpful in determin-

ing whether injunctive relief is proper is phrased as follows:

The dissenting opinion in *Sinclair* suggested the following principles for the guidance of the district courts in determining whether to grant injunctive relief—principles that we now adopt:

"A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." [*Sinclair Refining Co. v. Atkinson*] 370 U.S. [195], at 228, 82 S.Ct. [1328], at 1346, 8 L.Ed.2d [440], at 460. (Emphasis in original.) 398 U.S. at 254, 90 S.Ct. at 1594.

This language does not refer to an employer's duty to arbitrate before obtaining an injunction. Rather, the statement indicates that an injunction, in addition to enjoining the strike, should order the employer to arbitrate the dispute.[39] Cf. *Inland Steel*, 505 F.2d at 300.

This court does not read the cases cited by the union as requiring the compa-

---

**39.** The preliminary injunction entered by the court in the instant case complied with this

requirement by specifically ordering the union and the company to arbitrate the dispute.

ny to make a formal demand for arbitration under the circumstances of this work stoppage. To require the company to demand arbitration in this case would be to require a mere formality.[40] Furthermore, the union's argument ignores the *Boys Markets* holding that section 301(a) establishes the jurisdiction of district courts to grant injunctive relief to compel the reference to arbitration of disputes which are arbitrable under the collective bargaining agreement. There is no requirement that the company must engage in the "mere ceremony" of demanding arbitration, particularly in view of the union's position that the dispute is not arbitrable, before it may seek injunctive relief in this court.

## ORDER

It is hereby ordered and decreed that defendants' motion to vacate the entry of the preliminary injunction be and is hereby denied.

**40.** The company seeks injunctive relief because it deems the dispute arbitrable. The union, on the other hand, defends against the injunction precisely on the ground that the dispute is not arbitrable. The union would arbitrate only if it believed that the dispute was arbitrable. If it agreed to arbitrate, it would have to end the work stoppage pending arbitration or be faced with an injunction under *Boys Markets*. See also the provisions of the collective bargaining agreement in section VIII I, Note 19, *supra*. Thus, in light of the fact that the question of the dispute's arbitrability had to be decided by this court, which finds that the dispute was arbitrable as the company had asserted throughout these proceedings, the court does not think that the company under these circumstances violated the "reasonable effort" requirement of section 8 of the Norris-LaGuardia Act. This issue, of course, differs from that considered in *Controlled Sanitation Corporation v. District 128, Machinists and Aerospace Workers*, 524 F.2d 1324 (3d Cir. 1975).

See also *Donnelly Garment Co. v. International Ladies Garment Workers' Union*, 99 F.2d 309 (8th Cir. 1938), cert. denied, 305 U.S. 662, 59 S.Ct. 364, 83 L.Ed. 430 (1939), wherein the company received notice from its employees that they refused to accept defendant union as their representative for collective bargaining purposes, and the company sought injunctive relief against the union's subsequent picketing and boycotting. The court viewed the "only doubtful question" before it as whether it appeared "from the allegations of the pleadings that the plaintiffs . . . should prove the exact case which they have alleged in their pleadings, the court would be required to deny them any relief" because of section 8 of the Norris-LaGuardia Act. The court concluded that, since the National Labor Relations Act imposes the duty on employers to bargain only with the employees' chosen representative, and since defendant union was not the representative any time after the employees notified the employer that they did not accept that union as their representative, the employer could have made no reasonable effort that would have aided settlement of the dispute. The court stated

. . . the law ought not to be construed so as to require of a party a mere idle ceremony, (citation omitted) . . . .

It is our opinion that Section (8 of Norris-LaGuardia) does not disclose an intention on the part of Congress to deny to a complainant a right to injunctive relief against the unlawful acts of a defendant where the facts and circumstances alleged in a complaint are such as might justify a finding (if the case were heard upon its merits) that any effort on the part of the complainant to settle the dispute out of which the case arose would have been unreasonable. (footnote omitted.) 99 F.2d at 317.